## United States District Court
## District Of Maine

|  |  |
|---|---|
| Robert C. Peck,<br><br>　　　　Plaintiff,<br><br>　　　v.<br><br>United States of America,<br>John Doe 1 (Federal Agent), and<br>John Doe 2 (Federal Agent),<br><br>　　　　Defendants. | No. 2:26-cv-00293-JAW |

## First Amended Civil Rights Complaint
## And Demand For Jury Trial

### Introduction

1. Robert C. Peck files this complaint under the Maine Civil Rights Act and Federal Tort Claims Act to uphold the fundamental First Amendment right of Americans to peacefully observe the public actions of their government.

2. Since January 20, 2025, the U.S. Department of Homeland Security (DHS) has deployed federal forces, including agents of U.S. Immigration and Customs Enforcement (ICE), to cities across the country.

1

3.     These federal immigration agents have executed a sweeping mass detention and deportation campaign directed against immigrants, the vast majority of whom are people of color. DHS's campaign has relied upon unconstitutional tactics like racial profiling, excessive force, warrantless arrests, warrantless home invasions, and denial of basic due process.

4.      Americans have responded by observing, documenting, and protesting DHS's terror campaign targeting immigrant communities of color. And those who have exercised their fundamental First Amendment rights to peacefully observe and protest have been met with violent retaliation from DHS, including at least two public observers shot to death by DHS agents under false pretenses, and with the unprecedented widespread deployment of false criminal charges.

5.     In January 2026, Maine became a target of DHS's war on immigrants of color with the announcement of ICE's "Operation Catch of the Day." Overnight, masked and armed ICE agents flooded the streets of Portland and nearby areas where they began snatching Maine's immigrants of color off the streets and from their workplaces and homes.

6.     Mainers like Mr. Peck exercised their First Amendment right to observe and document what ICE was doing in their neighborhoods. But, as part of an effort to silence dissent and shield themselves from accountability, ICE and other DHS agents have systematically retaliated against them.

7.    A key instrument of retaliation used by DHS against Mr. Peck and many other Americans poses a particularly grave threat to the rule of law: deploying a criminal statute, 18 U.S.C. § 111, to chill and punish protected free speech by falsely claiming that this statute makes it a crime for Americans merely to observe the public activities of federal agents.

8.    This retaliation against peaceful observers is just one part of a larger, and unprecedented, federal attack on First Amendment rights across the country in which DHS agents have intimidated, violently subdued, and shot at observers and protestors; DHS has reinforced its nationwide retaliation offensive by systematically making false factual allegations to justify its violence and by bringing meritless criminal charges against peaceful observers.

9.    On the morning of Thursday, January 22, 2026, in Scarborough, Maine, Mr. Peck, a U.S. citizen who lives in South Portland, was exercising his First Amendment right to observe DHS agents performing their duties in public.

10.    He was observing them because, that morning, masked and armed DHS agents arrived in his neighborhood and he feared that those agents, like many other DHS agents across the country, would use excessive force to capture and disappear immigrants without due process.

11.     His goals were to (a) see with his own eyes what federal immigration agents were doing in his community so he could be a better-informed citizen; (b) join with other Americans in standing up for the fair treatment and equality of his immigrant neighbors of color; and (c) resist the federal administration's march toward totalitarianism.

12.     Though Mr. Peck was merely observing them from a safe distance, the John Doe Defendants—two masked and armed DHS agents—came to his car window and repeatedly (a) accused him of violating 18 U.S.C. § 111, which prohibits forcibly impeding or interfering with federal agents performing official duties; and (b) threatened to forcibly arrest him for that serious felony. But no reasonable agent could have believed Mr. Peck was committing that crime.

13.     Mr. Peck brings this case, in part, under the Maine Civil Rights Act (MCRA), 5 M.R.S. § 4682 (2026), which provides a cause of action for violations of the U.S. Constitution. Mr. Peck seeks redress for the John Doe Defendants' unconstitutional actions in violation of (a) the Fourth Amendment by unlawfully seizing him without reasonable suspicion or probable cause and (b) the First Amendment by falsely accusing him of committing the crime of violating 18 U.S.C. § 111 and threatening to use physical force to arrest him if they perceived him ever again to be "following" DHS agents operating in public.

4

14.     Mr. Peck also brings this case against the United States of America under the Federal Tort Claims Act, 28 U.S.C. § 2671-80 (FTCA), for the tortious acts, under Maine law, of the John Doe Defendants whose conduct also violated his federal constitutional rights including the torts of assault; battery; false arrest and imprisonment; intentional infliction of emotional distress; and negligent infliction of emotional distress.

## Parties

15.     Plaintiff Robert C. Peck is a U.S. citizen who was born in Maine and resides in South Portland, Cumberland County, Maine.

16.     He retired about three years ago after 18 years of employment as a mental health counselor with the U.S. Department of Veterans Affairs at its Vet Center in Portland, Maine. He served the VA for 20 years in his role as a licensed clinical social worker.

17.     Defendant United States of America is the government of the United States.

18.     Defendant John Doe 1 is a federal agent who participated in the seizure of and retaliation against Mr. Peck and is depicted in the video attached as Exhibit 1. John Doe 1 was acting under color of federal law and within the scope of his federal employment and duties. He is sued in his individual and personal capacity.

19.     Defendant John Doe 2 is a federal agent who participated in the seizure of and retaliation against Mr. Peck and is depicted in the video attached as Exhibit 1. John Doe 2 was acting under color of federal law and within the scope of his federal employment and duties. He is sued in his individual and personal capacity.

## Jury Trial Demand

20.     Under Fed. R. Civ. P. 38(b), Plaintiff demands trial by jury on all issues triable to a jury.

## Jurisdiction and Venue

21.     This action arises under (a) the First and Fourth Amendments of the United States Constitution with the remedies provided by the Maine Civil Rights Act, 5 M.R.S. § 4682, for violations of the "the rights secured by the United States Constitution," *id.* § 4682(1-A); and (b) the FTCA.

22.     On January 30, 2026, Mr. Peck filed a notice of claim with DHS and ICE under the FTCA, 28 U.S.C. § 2675(a). Mr. Peck's notice of claim is attached as Exhibit 2.

23.     DHS and ICE have failed to make final disposition of Mr. Peck's administrative claim filed on January 30, 2026, under the FTCA, and Mr. Peck has exercised his option under the FTCA to deem this failure to be a final denial of his claim for purposes of 28 U.S.C. § 2675(a).

6

24.    Thus, the six-month administrative process for his FTCA claims was exhausted on July 30, 2026.

25.    This Court has proper subject matter jurisdiction over Mr. Peck's claims under (a) 28 U.S.C. § 1331 because the claims arise under the First and Fourth Amendments of the United States Constitution and the FTCA; and (b) 28 U.S.C. § 1346(b) because Plaintiff is seeking money damages against the United States under the FTCA.

26.    Venue is proper in the District of Maine under 28 U.S.C. § 1391(e)(1)(B) because the events giving rise to Mr. Peck's claims all occurred in Cumberland County, Maine and under 28 U.S.C. § 1391(e)(1)(C) because Mr. Peck resides in Cumberland County, Maine. This action should be tried in Portland under Rule 3(h) of the Local Rules of this Court because venue is proper in Cumberland County.

## Detailed Facts

### I.    DHS Terrorizes Maine with its "Operation Catch of the Day."

27.    On Tuesday, January 20, 2026, ICE stormed into Portland, Maine and the surrounding areas in an unprecedented invasion it publicly touted as "Operation Catch of the Day."

28.   ICE told Fox News on January 20 that it had "1,400 targets here in Maine."[1] To meet that target, masked ICE officers in tactical gear began making violent arrests across the city, accosting Black and Brown Mainers—the vast majority of whom were fully complying with all immigration laws and had no criminal record—as they went to work and dropped their kids off at school.

29.   On January 21, 2026, ICE issued a press release[2] falsely claiming its surge was "targeting the worst of the worst criminal illegal aliens across Maine." But by the end of "Operation Catch of the Day," only 11 of the nearly 200 Mainers detained by ICE "were recorded as having a criminal record."[3]

30.   Many of the people detained by ICE in its "Operation Catch of the Day" were complying with the applicable legal procedures for immigrants to live and work in this country.

---

[1] Patrick Whittle and Rodrique Ngowi, *"ICE activity increases in Maine as anxiety grows in immigrant communities,"* AP News (January 21, 2026), https://apnews.com/article/maine-ice-immigration-enforcement-778b02cc97e390edbc598def9e6ff317.

[2] Department of Homeland Security press release, *ICE Launches "Operation Catch of the Day" Targeting the Worst of Worst Criminal Illegal Aliens Across Maine* (Jan. 21, 2026), https://www.dhs.gov/news/2026/01/21/ice-launches-operation-catch-day-targeting-worst-worst-criminal-illegal-aliens.

[3] Callie Ferguson, *Only 11 arrested during ICE's Maine surge had criminal records, new data show*, The Maine Monitor (Apr. 1, 2026), https://themainemonitor.org/only-11-arrested-ice-surge-criminal-records/#:~:text=Only%2011%20people%20were%20recorded,threat%20for%20a%20misdemeanor%20conviction.

31.     Nearly a quarter of the people arrested challenged their detentions as unlawful and most of them won their cases resulting in court orders that they be released.[4] Yet many of those victims of unlawful detention by ICE were only released after they endured harrowing and dehumanizing conditions at overcrowded detention centers.

32.     Maine's Cumberland County Sheriff, Kevin Joyce, publicly denounced ICE's actions during the surge as "bush league policing" after ICE agents arrested a "squeaky clean"[5] corrections officer who was a Black immigrant from Angola.

33.     Based on his observations of the ICE operation, Sheriff Joyce concluded ICE was telling Mainers, "one story, which is totally different than what's occurring." Sheriff Joyce summed up ICE's actions in Maine this way: "I guess if you're not a card-carrying U.S. citizen, then you must be illegal."[6]

---

[4] Rachel Estabrook & Emily Allen, *Mainers detained by ICE are coming home by the dozens*, Portland Press Herald (Mar. 1, 2026, updated Mar. 2, 2026), https://www.pressherald.com/2026/03/01/mainers-detained-by-ice-are-coming-home-by-the-dozens/.

[5] This corrections officer recruit was recently released from detention and returned to his job with the Cumberland County Sheriff's Department. Morgan Womack, *Cumberland County officer detained by ICE is back at work*, Portland Press Herald (Apr. 24, 2026), https://www.pressherald.com/2026/04/24/cumberland-county-corrections-officer-detained-by-ice-is-back-at-work/.

[6] Patty Wright, *Cumberland County Sheriff Kevin Joyce denounces actions by ICE agents in Maine*, Maine Public (Jan. 22, 2026), https://www.mainepublic.org/courts-and-crime/2026-01-22/cumberland-county-sheriff-kevin-joyce-denounces-actions-by-ice-agents-in-maine; https://www.youtube.com/watch?v=1SURP3G_y94.

34.     The racial animus and profiling undergirding ICE's operations in Maine and throughout the United States were captured in a January 2026 text message from an ICE leader of "Catch of the Day" bragging about sending "African" immigrants in southern Maine "back to their shithole countries," the racist slur used by President Trump to denigrate Black immigrants from Africa.[7]

35.     Indeed, President Trump repeatedly made racist, anti-immigrant comments when running for a second term including about how migrants crossing the southern border are "poisoning the blood" of the United States and are "destroying the blood of our country, they're destroying the fabric of our country." "They come from Africa, they come from Asia, they come from South America," he said, lamenting what he said was a "border catastrophe."[8]

36.     Federal courts have repeatedly found that the current administration's immigration enforcement actions are rooted in racism. *See*

---

[7] *Read all of the texts between Portland, South Portland police and immigration agent*, Portland Press Herald (Mar. 12, 2026) https://www.pressherald.com/2026/03/12/read-all-of-the-texts-between-portland-south-portland-police-and-immigration-agent/.

[8] Hannah Fingerhut & Ali Swenson, *Trump defends controversial comments about immigrants poisoning the nation's blood at Iowa rally*, AP News (Dec. 19, 2023), https://apnews.com/article/donald-trump-immigration-iowa-dff7f632948fa6511fb7d1955a28610c; Maggie Haberman & Michael Gold, *Trump, at Fund-Raiser, Says He Wants Immigrants from 'Nice' Countries*, N.Y. Times (Apr. 7, 2024), https://www.nytimes.com/2024/04/07/us/politics/trump-immigrants-nice-countries.html (reporting that at a fundraiser in April 2024 President Trump "lamented that people were not immigrating to the United States from 'nice' countries 'like Denmark'" and said, "Nice countries, you know like Denmark, Switzerland? Do we have any people coming in from Denmark? How about Switzerland? How about Norway?").

*e.g. Hussen v. Noem*, 822 F. Supp. 3d 944, 989 (D. Minn. 2026) (finding of fact based on evidentiary hearing that 23 individuals were "detained by DHS officers and questioned about their immigration status **based solely on their race or ethnicity**") (emphasis added); *Garcia Lanza v. Noem*, 822 F. Supp. 3d 326, 329, 337-38 (E.D.N.Y. 2026) (making factual finding based on evidentiary record that ICE arrested plaintiff solely because he "looked Latino" and this reliance on invidious race discrimination appeared to be "widespread").

37.    ICE's "Catch of the Day" operation forced many law-abiding Mainers of color into hiding. They were afraid to go to work, buy groceries, take their children to school, or see the doctor for fear they would be targeted simply because of the color of their skin or their accent. Businesses closed, and once-vibrant parks and community spaces fell silent.

38.    Mainers who were not at risk of being targeted for immigration enforcement stepped up to help their neighbors who were being targeted. From delivering food to people stuck at home to walking kids to school or standing watch in neighborhood spaces, they did what they could to keep their friends, neighbors, and loved ones safe.

39. Given widespread reporting of constitutional violations by ICE and other DHS agents around the country,[9] one common way that community members sought to help their neighbors was observing and recording ICE officers when they came to neighborhoods to look for or arrest people of color who were immigrants.

40. Without observers bearing witness and recording ICE officers, a member of the community could simply disappear—the only sign of their arrest an empty car on the side of the road—and it could take many days for their loved ones to locate them in the vast immigration detention system, especially because DHS was blocking detainees from communicating with lawyers or loved ones.

41. Observing and recording ICE and other DHS agents was also essential for public safety and accountability for constitutional violations by ICE officers. For example, on January 22, 2026, beginning at about 8:46 am, bystanders recorded the violent arrest and abduction of Juan Sebastian Carvajal-Muñoz in Portland.[10]

---

[9] *See, e.g.*, *Ramirez Ovando v. Noem*, 810 F.Supp.3d 1209, 1231 (D. Colo. 2025); *Escobar Molina v. U.S. Dep't of Homeland Sec.*, 811 F.Supp.3d 1, 49 (D.D.C. 2025); *United Farm Workers v. Noem*, 785 F. Supp. 3d 672, 734 (E.D. Cal. 2025); *Castañon Nava v. Dep't of Homeland Sec.*, 806 F. Supp. 3d 823 (N.D. Ill. 2025).

[10] Rose Lundy & Josh Keefe, *Masked agents detail civil engineer in Portland, leave his car running in street with a smashed window*, The Maine Monitor (Jan. 22, 2026) https://themainemonitor.org/masked-agents-smash-window-detain-engineer-portland/.

12

42.    Mr. Carvajal-Muñoz later sued the ICE agents who abducted him for violations of his constitutional rights, which were captured on video.[11] People observing the arrest also helped to protect public safety by securing Mr. Carvajal-Muñoz's car, which ICE agents dangerously left running by the side of the road with a smashed window.

43.    Facing widespread opposition from organized community members and elected officials, ICE's "Operation Catch of the Day" ended just days after it started, with ICE falling far short of its quota.

## II.    Mr. Peck Exercises His First Amendment Rights by Legally Observing DHS Agents in His Neighborhood during "Operation Catch of the Day."

44.    In early January 2026, Mr. Peck and many of his neighbors became increasingly alarmed about the campaign of terror by ICE and other DHS agents in Minneapolis, Minnesota and the risk that this type of surge would soon be directed at Greater Portland.

45.    In response, Mr. Peck prepared for a possible invasion of his community by ICE. For example, he studied his rights as an observer and how to exercise those rights peacefully and lawfully; he also practiced filming ICE agents in public.

---

[11] Complaint, *Carvajal-Muñoz v. Ravencamp*, No. 2:26-cv-00190-JCN (D. Me. April 14, 2026).

46.   And Mr. Peck made connections with like-minded Mainers about how best to prepare for a surge by ICE in the Greater Portland area, including signing up for training about his rights and responsibilities while observing ICE's public activities.

47.   On the morning of January 22, 2026, between about 9:00 and 9:30 am, Mr. Peck was sitting on the sofa in the living room of his apartment when he heard whistles, car horns, and a general commotion; he quickly jumped up after realizing the alerts were due to the activity of DHS agents[12] near the Mexican restaurant that he can see across the street from his apartment window and that he frequents as a customer.

48.   He quickly headed to the restaurant to find out what was happening and a woman there told him that there was an ICE vehicle in the area; he then talked to other concerned neighbors.

49.   He eventually saw DHS agents drive away in an unmarked silver SUV with New York license plates.

50.   Mr. Peck followed the DHS agents' vehicle ("DHS Vehicle Number 1") in his car so that he could observe their activities. He wanted to be a good neighbor by learning what the DHS agents were doing in his

---

[12] Although ICE announced "Catch of the Day" as its operation in Maine, the armed agents Mr. Peck saw in person on January 22, 2026, did not identify which federal agency they were working for; thus, this Complaint refers to them as DHS agents.

neighborhood and, if need be, by documenting their actions if they violated anyone's rights.

51.  To ensure he did not impede the DHS agents he was following, Mr. Peck kept at least one other vehicle between his vehicle and the DHS vehicle whenever he was following a DHS vehicle that day.

52.  Mr. Peck never tailgated or got unusually close when he was following a DHS vehicle on the morning of January 22, 2026.

53.  While he was following DHS Vehicle Number 1, in South Portland, Mr. Peck saw it accelerate through a red light. He did not follow but instead stopped at the red light.

54.  After DHS Vehicle Number 1 flew through the red light, Mr. Peck lost sight of it, found it, and began following it again in the adjacent town of Scarborough, but then lost sight of it again. So he went to the nearby ICE field office in Scarborough, at 40 Manson Libby Road near Route 1, to observe ICE activity there.

55.  A different SUV, a black Ford Explorer with Massachusetts license plates (No. 1B7V87), pulled out of the parking lot of the Manson Libby Road ICE field office. Mr. Peck then followed that vehicle ("DHS Vehicle Number 2") to observe the DHS agents, who are the John Doe Defendants in this action.

56.    While following DHS Vehicle Number 2, Mr. Peck was again careful to drive a safe and respectful distance.

57.    He again kept at least one other vehicle between his vehicle and DHS Vehicle Number 2. By staying back in that manner, Mr. Peck ensured that he never came even close to getting in the way of DHS Vehicle Number 2 or in any way suggesting that he intended to block, ram, or interfere with the free movement of the John Doe Defendants or DHS Vehicle Number 2.

58.    Mr. Peck observed DHS Vehicle Number 2 go through a red light on Lincoln Avenue to turn left on Route 1. Once again, he did not follow but instead stopped at the red light and temporarily lost sight of DHS Vehicle Number 2.

59.    This dangerous maneuver of DHS Vehicle Number 2 showed the John Doe Defendants' willingness to risk causing injuries to innocent bystanders for no apparent reason and raised Mr. Peck's sense of alarm and vulnerability, especially because he had just witnessed DHS Vehicle Number 1 also dangerously run a red light.

60.    Mr. Peck never came close to making any physical contact with the John Doe Defendants or DHS Vehicle Number 2. He never made any form of threat or display of aggression toward them or their vehicle.

16

61. In short, Mr. Peck did nothing that could possibly cause the John Doe Defendants to reasonably fear pain, bodily harm, or death when he was following them at a safe distance.

### III. The John Doe Defendants Detain Mr. Peck and Threaten him with Forcible Arrest for Exercising His First Amendment Rights.

62. While Mr. Peck was headed southeast on Route 1, he once again caught sight of DHS Vehicle Number 2 at the Suburban Home Outfitters store.

63. Mr. Peck followed DHS Vehicle Number 2 until it turned onto Milliken Road and stopped.

64. Mr. Peck then pulled his car to the side of the road at a safe distance from DHS Vehicle Number Two, as shown in the video attached as Exhibit 1.

65. As the video shows, Mr. Peck's parked vehicle was in no way obstructing the John Doe Defendants' parked vehicle or their freedom of movement.

66. The John Doe Defendants exited their vehicle and approached Mr. Peck's vehicle.

67. They wore masks to hide their faces and tactical vests that said "POLICE."

68.    The John Doe Defendants, pictured below, also had weapons and ammunition strapped to their vests and handguns on their belts.



69.    Mr. Peck began recording this encounter on his smart phone. The video Mr. Peck recorded is attached as Exhibit 1. This encounter occurred between about 9:35 and 9:55 am.

18

70.    The John Doe Defendants ordered Mr. Peck to lower his window, and he complied because he was afraid that they would break his window or use force against him if he did not lower his window or if he tried to drive away.

71.    Mr. Peck reasonably understood that he was being detained by the John Doe Defendants and was not free to refuse their order to lower his window or to drive away.

72.    Mr. Peck was reasonably concerned that the John Doe Defendants would use physical force against him or his car if he refused the John Doe Defendants' order to lower his window or if he drove away.

73.    Mr. Peck did not consent to his detention by the John Doe Defendants.

74.    The John Doe Defendants intended to detain Mr. Peck and to convey to him that he was not free to leave and they did just that.

75.    Mr. Peck knew that, about two weeks earlier on January 7, 2026, ICE agents in Minneapolis had shot and killed a neighborhood observer, Reneé Good, purportedly for attempting to drive away while they were attempting to detain her.[13]

---

[13] *ICE agent shoots, kills U.S. citizen Renee Good in south Minneapolis*, CBS News, (Jan. 9, 2026) https://www.cbsnews.com/minnesota/live-updates/minneapolis-ice-agent-shooting-protesters-clash-fbi-investigation/.

19

76.    And Mr. Peck knew that top officials of DHS and the federal Executive Branch had labelled Ms. Good as a "domestic terrorist" because she had been observing ICE agents in her neighborhood.

77.    Mr. Peck was further aware that on January 13, 2026, in Minneapolis, four ICE agents dragged Aliya Rahman, a woman with autism who was a U.S. citizen on her way to a medical appointment, from her car and carried her face down while she was crying for help; they then hoisted her into their unmarked car and held her for hours before releasing her without pressing any charges.[14]

78.    One of the John Doe Defendants, who was the closer of the two and will be referred to as Agent John Doe 1, asked Mr. Peck if he was following them, and Mr. Peck confirmed that he was.

79.    Agent John Doe 1 told Mr. Peck, "what you're doing is called impeding federal law enforcement," and "it's an 18 USC charge 111."

80.    He then sternly admonished Mr. Peck, "this is your first and only warning, if you continue to impede us and follow us, you will be arrested."

81.    Mr. Peck corrected what Agent John Doe 1 had said and explained that he was not impeding them.

---

[14] Ben Hovland, *Photojournalist's notebook: Watching a woman dragged away pleading, 'I'm just trying to get to the doctor'*, MPR News (Jan. 13, 2026) https://www.mprnews.org/story/2026/01/13/ice-enforcement-shooting-in-minnesota-latest-tuesday.

82.    The other John Doe Defendant, who had BOS-05 printed on his vest and will be referred to as Agent John Doe 2, responded that Mr. Peck had "just openly admitted" he was following them.

83.    Mr. Peck responded by explaining that he was following them, but he was only observing them, not impeding them.

84.    Agent John Doe 2 then stressed that Mr. Peck was "impeding," even though Mr. Peck was merely following DHS Vehicle Number 2 on public roadways to observe the John Doe Defendants' public actions.

85.    Agent John Doe 2 then explicitly threatened Mr. Peck: "that's your one warning, if you keep doing it, we'll pull you back out and arrest you."

86.    Agent John Doe 2's tone, body language, and final warning—"if you keep doing it, we'll pull you back out and arrest you"—gave Mr. Peck good reason to believe that, if the John Doe Defendants ever saw Mr. Peck in his vehicle again, they would go out of their way to use physical force to arrest him and charge him with the federal crime of violating 18 U.S.C. § 111.

87.    During the stop, Agent John Doe 1 repeatedly put his hand on the passenger door of Mr. Peck's car and next to the partially open window. Because of this offensive contact and other evidence of aggressiveness by

21

these and other DHS agents towards observers, Mr. Peck feared that Agent John Doe 1 might grab him through the window and forcibly arrest him.

88.    Mr. Peck's fear was reasonable: He knew that earlier the same morning at about 8:46 am in downtown Portland, just a few miles away from Mr. Peck's encounter, ICE agents cut a man off as he was driving to work, smashed his window, and pulled him out of the car, leaving it running as they sped away with him in their vehicle.[15]

89.    Mr. Peck also knew that the day before, again in Portland, DHS agents boxed in a family's car in a supermarket parking lot, smashed the driver's window, and pulled the driver out of the car and into an unmarked vehicle, leaving a baby in a car seat in the car covered in broken glass.[16]

90.    Mr. Peck was further aware of numerous instances in which ICE or other DHS agents around the country had assaulted—and in the recent example of Reneé Good, killed—neighborhood observers in their vehicles.

91.    Mr. Peck also knew that in the days after Reneé Good's murder, ICE and U.S. Customs and Border Protection agents of DHS had doubled

---

[15] Complaint, *Carvajal-Muñoz v. Ravencamp*, No. 2:26-cv-00190-JCN (D. Me. April 14, 2026);   Rose Lundy & Josh Keefe, *Masked agents detail civil engineer in Portland, leave his car running in street with a smashed window*, The Maine Monitor (Jan. 22, 2026) https://themainemonitor.org/masked-agents-smash-window-detain-engineer-portland/.
[16] Dylan Tusinski & Salomé Cloteaux, *ICE agents shatter window, leave 1-month-old baby, mother in car after Portland arrest*, Bangor Daily News (Jan. 29, 2026) https://www.bangordailynews.com/2026/01/29/portland/portland-police-courts/ice-arrest-aftermath-portland-maine/.

down on threats to use excessive force against neighborhood observers, with multiple agents in Minneapolis using Good's death to threaten observers, saying "You did not learn from what just happened?" or "have ya'll not learned from the past couple days?"[17]

92.    Given those publicized incidents, combined with the tone and body language of the agents who detained him, Mr. Peck understood them to be invoking the threat of physical force and serious physical injuries to dissuade him from continuing to observe them or other federal immigration agents.

93.    Mr. Peck felt like he was in a dangerous situation in which the armed DHS agents could quickly escalate to using violence against him.

94.    At the age of 67, Mr. Peck was also worried that the use of force by the John Doe Defendants would cause him serious harm, especially because he had several pre-existing injuries.

95.    Because he didn't feel free to leave, Mr. Peck felt like he was a sitting duck and did everything he could to stay calm and not inadvertently give the DHS agents any excuse to brutalize him.

---

[17] Noah Hurowitz, *Federal Agents Keep Invoking Killing of Renee Good to Threaten Protesters in Minnesota*, The Intercept (Jan. 14, 2026) https://theintercept.com/2026/01/14/ice-minneapolis-protests-renee-good/.

96.     While observing and interacting with the John Doe Defendants, Mr. Peck had no intention and did not in any way unlawfully impede or interfere with their actions or performance of their official duties.

## IV.   The John Doe Defendants' Unconstitutional Actions Cause Mr. Peck Ongoing Injuries and Chill His Exercise of His First Amendment Rights.

97.     When the John Doe Defendants allowed Mr. Peck to leave, he drove back to Route 1 fearful that they would pull him over on the pretext that he violated their warning never to follow them again.

98.     Once back on Route 1, Mr. Peck looked for the safest location where he could avoid the John Doe Defendants and other DHS agents and begin to process how they accused him of criminal conduct and threatened to forcibly arrest him for exercising his First Amendment rights.

99.     Mr. Peck pulled into a busy parking lot and parked between other parked cars. As soon as he turned off his car, he began shaking uncontrollably; he tried to use his smart phone to review the video he had made of the terrifying incident, but his hands were trembling so much he could not operate his phone or access the video.

100.    Mr. Peck felt intense waves of stress as if he had been in a serious car accident. He also felt deeply humiliated and ashamed by his

helplessness in response to the degrading and physically menacing treatment he received from the John Doe Defendants.

101.  Mr. Peck eventually regained his composure enough to drive directly home. He spent the rest of the day at home afraid to go out in his car.

102.  On the evening of January 22, 2026, Mr. Peck experienced unusual difficulty falling asleep. His mind kept replaying what it would sound like and how he would respond if ICE agents knocked on his door and entered his apartment to forcibly seize him and take him outside in the bitter cold to jail without allowing him to dress for the outdoors.

103.  Because of the threats of forcible arrest by the John Doe Defendants, Mr. Peck stopped his First Amendment activity of observing DHS agents by following their vehicles in public at a safe distance.

104.  After the John Doe Defendants detained and threatened Mr. Peck, he began taking precautions in case federal agents came back to arrest him. For example, he collected a list of emergency contacts, secured his official identification documents, and drew up a safety plan.

105.  Similarly, Mr. Peck changed his behavior while driving his car or in public to frequently scan for possible DHS vehicles. For example, whenever he turns onto a side street, he is especially vigilant to look for any vehicle that might belong to DHS.

106. Beginning on January 22, 2026, Mr. Peck disclosed to family and friends the details of how the John Doe Defendants detained and threatened him.

107. In response to his reports, family and friends were for the most part supportive and sympathetic. But they also expressed concern about possible further retaliation by ICE agents against Mr. Peck or against them or other family and friends if ICE were to track him and discover his connection to them.

108. For example, family and friends of Mr. Peck asked him to either park at a distance when visiting them or to not visit them at all for fear that his visits would attract the attention of ICE and its possible retaliation against them.

109. Since his detention by the John Doe Defendants, Mr. Peck has also experienced fear and anxiety over possible retaliation by ICE and DHS against a loved one who is especially vulnerable to their punitive actions.

110. The fear by Mr. Peck and his family and friends that DHS will further retaliate against him or them because of Mr. Peck's exercise of his First Amendment rights was and is reasonable given the John Doe Defendants' explicit threats and the documented instances of ICE agents retaliating against observers, including by going to the homes of Mainers who had observed ICE activity.

26

111.   For example, three vehicles of government agents showed up at the home of one neighborhood observer in Maine. An agent went to the door and told the observer, "[t]his is a warning. We know you live right here."[18] And other observers following ICE agents reported that the agents led the observers to their own homes and took actions like pointing at the homes or honking when they drove by to show that they know where the observers live.[19]

112.   Mr. Peck's fear of a violent arrest or other retaliation against him (or his family or friends) was and is also reasonable given ICE's nationwide practice of retaliating against neighborhood and other legal observers.

113.   Federal agents deployed to Los Angeles, for example, shot legal observer Charles Xu with a pepper ball while he was filming an immigration arrest. After the shooting, a coalition of journalists, citizen observers, and protesters sued to stop ICE's unlawful use of force. On September 10, 2025, a federal court granted their motion for a preliminary injunction. *See Los Angeles Press Club v. Noem*, 799 F. Supp. 3d 1036 (C.D. Cal. 2025), *affirmed in part and vacated in part*, 171 F.4th 1179 (9th Cir. 2026).

---

[18] Salomé Cloteaux & Dana Richie, *ICE watchers in Maine say they were threatened by federal agents*, Portland Press Herald (Jan. 23, 2026) https://www.pressherald.com/2026/01/23/ice-watchers-in-maine-say-they-were-threatened-by-federal-agents/.

[19] Kristian Moravec & Sean Scott, *ICE observers say immigration agents tried to intimidate them. One man is pursuing legal action*, The Maine Monitor (Jan. 30, 2026) https://themainemonitor.org/ice-observers-intimidation-legal-action/.

114.   Mr. Peck learned from news reports on about March 12, 2026, that an observer of ICE in Chicago, Marimar Martinez, was shot several times in October 2025 while observing and following ICE agents in her car.[20]

115.   In Minnesota, ICE's violent campaign—dubbed "Operation Metro Surge"—inspired protestors and legal observers throughout the Twin Cities. ICE retaliated against this protected conduct "with an explosion of constitutional violations." Complaint, *Tincher v. Noem*, 25-cv-4669, ECF No. 1 at ¶ 83 (D. Minn. Dec. 17, 2025). After a purported class of legal observers sued to stop ICE, a district court granted a preliminary injunction. *Tincher v. Noem*, 816 F. Supp. 3d 931 (D. Minn. 2026), *order dissolved sub nom,* No. 0:25-CV-4669 (KMM/DTS), 2026 WL 948946 (D. Minn. Apr. 8, 2026).

116.   In southern California, Julian Pecora Cardenas followed vans full of Border Patrol agents and livestreamed their movements on Instagram in July 2025. In response, the Border Patrol agents pulled Mr. Pecora Cardenas from his vehicle and slammed him to the pavement causing him to suffer a concussion and a facial laceration that required stitches.[21]

---

[20] Ruby Cramer, *Shot By Border Patrol, Then Called A 'Domestic Terrorist'*, The New Yorker (Mar. 12, 2026) https://www.newyorker.com/news/annals-of-immigration/shot-by-border-patrol-then-called-a-domestic-terrorist.

[21] A.C. Thompson & Gabrielle Schonder, *Caught in the Crackdown: As Arrests at Anti-ICE Protests Piled Up, Prosecutions Climbed*, Pro Publica (Apr. 14, 2026) https://www.propublica.org/article/caught-in-crackdown-ice-cbp-doj-trump-arrests-convictions?utm_campaign=propublica-sprout&utm_content=1778334563&utm_medium=social&utm_source=threads

117.    Federal prosecutors then charged Mr. Pecora Cardenas under 18 U.S.C. § 111 with conspiracy to impede federal agents. The DHS agents falsely claimed that he had illegally maneuvered his vehicle to stay behind the Border Patrol vans and that he created a hazardous condition on the road. Mr. Cardenas' video footage contradicted these agents' claims and, within days after seeing that footage, the prosecutor dropped the charges against Mr. Cardenas.[22]

118.    As Mr. Peck is aware from public reports, the evidence continues to mount that DHS has a practice of vigorously pursuing unfounded criminal charges, for allegedly attacking or interfering with ICE agents, against legal observers and demonstrators, including the use of fabricated evidence.[23]

119.    A recent New York Times investigation found that the federal government has filed hundreds of meritless criminal cases alleging that people violated 18 U.S.C. § 111 while interacting with federal immigration agents.[24]

---

[22] *Id.*

[23] Mariah Timms and Joseph Pisani, *Prosecutors Drop Charges Against Anti-ICE Protesters in Chicago*, Wall Street Journal (May 21, 2026), https://www.wsj.com/us-news/law/prosecutors-drop-charges-against-anti-ice-protesters-in-chicago-27c94c55; Sophia Compton, *ICE officers face criminal probe for alleged 'untruthful statements' under oath about Minneapolis shooting*, Fox News (Feb. 14, 2026), https://www.foxnews.com/politics/ice-officers-face-criminal-probe-alleged-untruthful-statements-under-oath-about-minneapolis-shooting; *Jason Rantala, Report says hundreds charged with impeding feds amid ICE surge*, CBS News (Feb. 10, 2026), https://www.cbsnews.com/minnesota/news/ice-observers-charged-impeding-officers-report/

[24] Mike McIntire, Danny Hakim, Alexandra Berzon, Jazmine Ulloa, and Lauren McCarthy, *They Were Charged With Assaulting ICE Agents. The Cases Are Crumbling*, NY Times

29

120.    In public statements, DHS's leadership has confirmed its open disregard for the First Amendment rights of legal observers like Mr. Peck.

121.    President Trump has repeatedly said publicly, including in June 2025, that any protestors and legal observers across the country would be "met with very big force."[25]

122.    On September 25, 2025, President Trump issued a presidential memorandum directing the National Joint Terrorism Task Force to investigate, prosecute, and disrupt individuals and groups that criticize law enforcement and border control policies.[26]

123.    Kristi Noem, while she was the Secretary of DHS from January 25, 2025, until March 24, 2026, similarly denounced the videotaping of ICE officers in public as "violence."[27] She also threatened protesters by saying that "the more that they protest and commit acts of violence against law enforcement officers, the harder ICE is going to come after them."[28]

---

(July 18, 2026), https://www.nytimes.com/video/us/100000010977388/how-criminal-cases-against-ice-protesters-are-crumbling.html.

[25] TIME, Trump Warns, Military Parade Protests Will Face 'Very Big Force,' YouTube (June 10, 2025), https://www.youtube.com/watch?v=kuKjAIBP8go&t=52s

[26] Presidential Memoranda, *Countering Domestic Terrorism and Organized Political Violence* (Sept. 25, 2025), https://www.whitehouse.gov/presidential-actions/2025/09/countering-domestic-terrorism-and-organized-political-violence/.

[27] Forbes Breaking News, *Kristi Noem Claims Videotaping ICE Agents is 'Violence' Following Camarillo, California Farm Raids*, YouTube (July 15, 2025), https://www.youtube.com/watch?v=uDFX4q6huH8.

[28] 12Fox News, *Train Wreck Mayor": Kristi Noem Slams LA Official, Fox News* (June 10, 2025) https://www.youtube.com/watch?v=ymYIXrH9pjg

124.   In an appearance on Fox News about a week before the John Doe Defendants detained Mr. Peck, White House Border Czar Tom Homan referred to going after "these people who want to follow ICE" and then stated that the government was going to create "a database" of people who interfere with or impede ICE officers: "We're going to make them famous. We're going to put their face on TV."

125.   Homan further threatened to report them to their "employers" and "schools," suggesting that he would try to get people fired and students expelled for observing or protesting ICE.[29]

126.    On January 18, 2026, in Minnesota, DHS agents bashed open the door of the home of a U.S. citizen, ChongLy Thao, at gunpoint and without a warrant. Federal officers forced him outside wearing only shorts in below freezing conditions and detained him before returning him home later that day without explanation.[30]

127.   The day before Mr. Peck's detention by the John Doe Defendants, he saw the video of the kidnapping of Mr. Thao by ICE and a video showing

---

[29] Ewan Palmer, *Trump's Moaning Border Czar Cooks Up Revenge Plot Against People Being Mean About ICE*, Daily Beast (Jan. 16, 2026) https://www.yahoo.com/news/articles/trump-moaning-border-czar-cooks-110738735.html?guccounter=1&guce_referrer=aHR0cHM6Ly93d3cuZ29vZ2xlLmNvbS8&guce_referrer_sig=AQAAAIqKAb6pagns2NR75S_3Vc93tqw_dQztuxOTgHJAL2UE1gzF6NqnS4iOcFoSWXKA84Ci3vcpUgOjfIY7jG7iSTljmh1QkGvMBKJUVsoi1p3UpvDqHRJTvaRNTGuW02iFLqGATigZSzDi7nuD9_TK8txwVLzc04o2oZT6MrJnwHVU.
[30]    Jack Brook, *US citizen says ICE took him at gunpoint in only underwear despite frigid cold and no warrant*, AP News (Jan. 20, 2026) https://apnews.com/article/minnesota-immigration-us-citizen-detained-hmong-d009590a491c0c8243ef21ef24db7182.

31

ICE agents telling an observer at a Home Depot in South Portland that they were being placed on "a domestic terrorist watchlist."[31]

128.   Similarly, on Friday January 23, 2026, a masked ICE agent pulled out a phone to record the face and car license plate number of a bystander, social worker Colleen Fagan, who was filming an ICE operation at an apartment complex in Portland. When Ms. Fagan asked the agent why he was taking her information, he said, "Cause we have a nice little database and now you're considered a domestic terrorist."[32]

129.   Ms. Fagan's video of the threat against her by an ICE agent went viral on January 23, 2026, and Mr. Peck saw it that day.

130.   DHS agents subjected two other U.S. citizens who live in Maine to enhanced screening at the Canadian border because one of them had exercised her constitutional right to observe DHS agents just two days before Mr. Peck's encounter with the John Doe Defendants.[33]

---

[31] First Amended Complaint, *Hilton v. Noem*, Case No. 2:26-cv-0092-JAW, ECF No. 29 at ¶¶ 66-69 (Apr. 27, 2026). The U.S. Department of Justice even had to concede that the ICE agents' treatment of this observer was improper. *See* Transcript of Hearing on Motion for Temporary Restraining Order at 25, *Hilton v. Noem*, Case No. 2:26-cv-0092-JAW (Mar. 16, 2026).

[32] Jude Joffe-Block, *A new lawsuit alleges DHS illegally tracked and intimidated observers*, NPR News (Feb. 23, 2026) https://www.npr.org/2026/02/23/nx-s1-5722988/dhs-lawsuit-biometrics-domestic-terrorism; Nathan Bernard [@nathanTbernard] (Jan. 23, 2026) *ICE agent in Portland, Maine tells legal observer she is a domestic terrorist for peacefully recording him, adds her to...* X, https://x.com/nathanTbernard/status/2014717658323665399.

[33] First Amended Complaint, *Hilton v. Noem*, Case No. 2:26-cv-0092-JAW, ECF No. 29 at ¶¶ 8-11, 66-69, and 86-93 (Apr. 27, 2026).

131.   Before the John Doe Defendants detained and threatened Mr. Peck, he knew that both the Vice President of the United States, JD Vance, and Stephen Miller, the highly influential political advisor serving as the White House Deputy Chief of Staff for Policy and Homeland Security Advisor, had publicly declared that ICE agents had absolute immunity for their actions.

132.   As a result of the John Doe Defendants' actions, Mr. Peck has lost the enjoyment of his prior freedoms to (a) drive his car and otherwise peacefully observe and record the public actions of ICE and other DHS agents in Maine; (b) drive his car generally without fear and apprehension of violent and sudden arrest including if he unintentionally drove in the vicinity of ICE or other DHS agents; and (c) be confident that, whether in his home or in public, law enforcement agents will be professional and committed to upholding the rule of law and not terrorizing and assaulting members of the public.

133.   Since the end of ICE's "Operation Catch of the Day," Mr. Peck's continuing injuries and damages have been exacerbated by the offensive and inhumane activities of ICE agents in Maine targeting his neighbors of color.

134.   Beginning in May 2026, there was an increase in ICE agents in greater Portland, including Mr. Peck's community of South Portland, and a

33

corresponding uptick in arrests.[34] Once again, Black and Brown Mainers feared leaving their homes, with school attendance dropping.

135.   At about 7:15 a.m. on Monday July 13, 2026, an ICE agent fatally shot Johan Sebastián Durán Guerrero in the head four times while he was driving in a car to work (and away from the ICE agent). This manifestly unjustified killing was perpetrated in Biddeford, Maine, which is about a 30-minute drive from Mr. Peck's home in South Portland.

136.   Mr. Durán Guerrero came to Maine from Colombia and received a U.S. work authorization in May 2025. He had no criminal record and was supporting his wife and their three-year old daughter when he was executed by an ICE agent.[35]

137.   On July 13, 2026, DHS offered conflicting statements about the shooting by ICE. In the morning, the Secretary of DHS, Markwayne Mullin,

---

[34] Drew Johnson, *ICE activity is increasing in Maine, immigration rights advocates warn*, Portland Press Herald (May 11, 2026), https://www.pressherald.com/2026/05/11/ice-activity-is-increasing-in-maine-immigration-rights-advocates-warn/; Dana Richie, *South Portland residents nervous about rumored increase in ICE activity*, Portland Press Herald (May 21, 2026), https://www.pressherald.com/2026/05/21/south-portland-residents-nervous-over-rumored-increase-in-ice-activity/.

[35] Jeanine Santucci and Christopher Cann, *Maine ICE shooting: Johan Sebastián Durán Guerrero, 25, ID'd as man killed*, USA Today (July 14, 2026), https://www.usatoday.com/story/news/nation/2026/07/14/maine-ice-shooting-biddeford-updates--live/90912659007/; Maria Santana, Annabella Gonzalez, Fernando Ramos, Jason Carroll, and Sarah Boxer, *What we know about the 25-year old father from Colombia who was fatally shot by an ICE officer in Maine*, CNN (July 15, 2026), https://www.cnn.com/2026/07/15/us/joan-sebastian-guerrero-ice-shooting-maine

told Maine U.S. Senator Angus King, Jr., that the driver who was shot had "weaponized his vehicle toward law enforcement."[36]

138.   But later, DHS issued a written statement that its agents were surveilling the last known address of an undocumented immigrant who was subject to a final order of removal from the country and, when ICE tried to stop a vehicle driven by someone coming from that address, "The vehicle attempted to flee the scene and, fearing for public safety, an officer discharged his weapon."[37]

139.   The reasonable fear of Mr. Peck and other Mainers that ICE agents will engage in further acts of unlawful and senseless violence in Maine has been reinforced by the brutal murder of Mr. Durán Guerrero and the evidence that DHS approved the shooter to be an ICE agent despite his

---

[36] Emma Davis, *Piecing together the events of the fatal ICE shooting in Biddeford*, Maine Morning Star (July 14, 2026), https://mainemorningstar.com/2026/07/14/piecing-together-the-events-of-the-fatal-ice-shooting-in-biddeford/; Jacey Fortin, Heather Beasley Doyle, Miriam Jordan, and Hamed Aleaziz, *ICE Agent Kills Person in Vehicle in Maine, Homeland Security Says*, N.Y. Times (July 13, 2026), https://www.nytimes.com/2026/07/13/us/biddeford-maine-ice-shooting.html?eafs_enabled=false

[37] Madaleine Rubin, *What We Know About the ICE Shooting in Maine*, N.Y. Times (July 13, 2026), https://www.nytimes.com/2026/07/13/us/ice-shooting-maine-guerrero.html?eafs_enabled=false. Under clearly established law, an agent's "fearing for public safety" does not justify the use of deadly force on a person fleeing arrest. *See, e.g., Tennessee v. Garner*, 471 U.S. 1 (1985) (Fourth Amendment prohibits use of deadly force unless officer has probable cause to believe suspect poses significant threat of death or serious physical injury to officer or others).

35

history of engaging in terrifying and violent behavior and being adjudged not credible by a Maine judge.[38]

140.    Mr. Durán Guerrero was the 22nd person shot by federal immigration officers since January 20, 2025, and 19 of those shootings were during traffic stops similar to the stop of Mr. Peck.[39]

141.    DHS has frequently falsely claimed its shootings were justified because the vehicles had been "weaponized" and the agents' lives were in danger.[40]

142.    As a result of the recent horrific shooting of Mr. Durán Guerrero and continued increased ICE presence in Maine, community members continue to organize to support their immigrant neighbors of color, including by observing, reporting, and protesting ICE activity.

---

[38]  Jack Brook, Michael R. Sisak, Amanda Swinhart, and Claire Galofaro, *AP Exclusive: ICE officer in Maine shooting has history of violent behavior, family and records say*, Associated Press (July 17, 2026), https://apnews.com/article/ice-david-brouillette-johan-guerrero-maine-shooting-dbc30d6d59e2a95fb470afc188e125c6; Callie Ferguson, *ICE agent who killed Biddeford man left a trail of disputed arrests*, Bangor Daily News (July 29, 2026), https://www.bangordailynews.com/2026/07/29/mainefocus/mainefocus-police-courts/ice-agent-fatal-biddeford-shooting-disputed-arrests-joam40zk0w/. Even Border Czar Homan conceded that if the allegations against the shooter are true, ICE's vetting process failed. Lisa Mascaro, *Trump's border czar says vetting of ICE officer is under internal review after Maine shooting*, Associated Press (July 26, 2026), https://apnews.com/article/maine-shooting-immigration-ice-vetting-9a8cfccc9e509766fb65effaa607a65b.

[39]  *See* Ariana Figueroa, *Traffic stops become a flashpoint in ICE shootings*, Government Executive (July 20, 2026), https://www.govexec.com/management/2026/07/traffic-stops-flashpoint-ice-shootings/414882/.

[40] Edgar Sandoval, *ICE Officer Kills a Mexican Man in Houston*, N.Y. Times (July 7, 2026), https://www.nytimes.com/2026/07/07/us/immigration-ice-shooting-houston.html

143.   Since the John Doe Defendants threatened him with a forcible arrest from his car, Mr. Peck has felt anxious when driving because he fears further encounters with ICE or other DHS agents, who will accuse him of following them and forcibly arrest him on the spot or shoot him.

144.   Mr. Peck lives directly across the street from the Mexican restaurant where DHS agents came to his neighborhood and alerts from his neighbors led him to jump out of his chair in his apartment. He is aware of sightings of DHS vehicles around this area since January 22, 2026.

145.   Mr. Peck's normal schedule of activities also frequently requires him to drive by the Scarborough Field Office of ICE where the John Doe Defendants came from right before they detained and threatened him.

146.   Since ICE's killing of Mr. Durán Guerrero, Mainers have repeatedly protested at the Scarborough Field Office of ICE, but Mr. Peck has not attended any of those protests.

147.   Seeing the places close to his apartment where he saw DHS vehicles and the Scarborough ICE office, along with many other internal and external reminders of his January 22 detention by the John Doe Defendants, on an almost daily basis trigger a physiological response and objective physical symptoms in Mr. Peck such as nausea, shaking, an increase in blood pressure and heart rate, fast breathing (hyperventilation), sweating, trembling, muscle tension, and digestive dysfunctions.

148.    Because of the John Doe Defendants' actions and his continuing reasonable fear of being assaulted or forcibly arrested and imprisoned by federal agents, Mr. Peck has suffered and continues to suffer physical harms and symptoms such as significantly elevated blood pressure levels, weight gain, severe insomnia, and uncontrollable trembling.

149.    In addition to humiliation, mental anguish, and anxiety, his severe emotional distress has manifested as feelings of helplessness, loss of control, depression, shock, hypervigilance, and hypersensitivity to stimuli, including to sights and sounds that bring back the abuse by the John Doe Defendants and trigger the feeling of extreme fear and anxiety they caused.

150.    Mr. Peck's severe emotional distress may easily be inferred from and resulted from the John Doe Defendants' extreme and outrageous misconduct and the pattern of misconduct against his fellow Mainers that has been widely reported in the press and acknowledged by the government leaders of Maine, including its Governor and the state's two United States Senators.

151.    Mr. Peck fully recognizes that his injuries caused by the John Doe Defendants' unconstitutional misconduct pale in comparison to the harms inflicted by DHS and ICE on immigrants of color in Maine.

**V.    Mr. Peck Seeks Relief Under the Maine Civil Rights Act for the John Doe Defendants' Violations of the U.S. Constitution.**

38

152. "For most of our history, those injured by federal officers' unconstitutional conduct could sue for damages in state court. The Framers saw state common-law suits as an important check on federal misconduct." *Buchanan v. Barr*, 71 F.4th 1003, 1012 (D.C. Cir. 2023) (Walker, J., concurring).

153. In the Westfall Act of 1988, Congress provided that the FTCA is generally the sole means of holding government employees liable for tortious conduct within the scope of their employment. 28 U.S.C. § 2679(b)(1). But Congress included an important exception to that general rule: it does not apply "to a civil action against an employee of the Government" that "is brought for a violation of the Constitution of the United States." *Id.* § 1679(b)(2)(A); *see Tanzin v. Tanvir*, 592 U.S. 43, 49 (2020) (noting that the Westfall Act "left open claims for constitutional violations").

154. This case falls within the exception to the Westfall Act because it is a civil action "brought for" violations of the First and Fourth Amendments of the U.S. Constitution. The cause of action for those violations is provided by the Maine Civil Rights Act (MCRA), 5 M.R.S. § 4682 (2026).

155. Under the MCRA, an individual can bring a "civil action for legal or equitable relief" against any "person" who interferes with their "enjoyment

39

of the rights secured by the United States Constitution." 5 M.R.S. § 4682(1-A) (2025).

156. Like state tort suits brought since the Founding, the MCRA creates the cause of action but the U.S. Constitution "ultimate[ly]" defines it. Akhil Reed Amar, *Of Sovereignty and Federalism*, 96 Yale L.J. 1425, 1506 (1987).

157. Because the Supreme Court has effectively eliminated *Bivens* actions, Mr. Peck is not pursuing a claim for damages directly under the U.S. Constitution.[41]

**Claims For Relief**

**Count I:**
**Violation of the First Amendment of the U.S. Constitution**
**under 5 M.R.S. § 4682**
*Against the John Doe Defendants Only*

158. Plaintiff re-alleges the preceding allegations.

159. It is well-established that the First Amendment protects people who are "[g]athering information about government officials." *Glik v.*

---

[41] *See, e.g., Jakuttis v. Town of Dracut*, 95 F.4th 22, 29 (1st Cir. 2024) (recognizing that *Egbert v. Boule*, 596 U.S. 482, 499 (2022) "held that 'there is no Bivens action for First Amendment retaliation'"); *Hornof v. United States*, 107 F.4th 46, 66 (1st Cir. 2024) (rejecting recognition of *Bivens* claim that "could implicate immigration and national security concerns") (citing *Egbert*, 596 U.S. at 496 as "determining that a court is not competent 'to authorize a damages action . . . against Border Patrol agents generally'"). *See generally Goldey v. Fields*, 606 U.S. 942, 945 (2025) ("For the past 45 years, this Court has consistently declined to extend *Bivens* to new contexts.).

*Cunniffe*, 655 F.3d 78, 82 (1st Cir. 2011) (First Amendment protected plaintiff's right to record law enforcement officers); *see also ACLU of Illinois v. Alvarez*, 679 F.3d 583, 602 (7th Cir. 2012) (law that prohibited recording of law enforcement officers enjoined under First Amendment); *Smith v. City of Cumming*, 212 F.3d 1332, 1333 (11th Cir. 2000) (subject to reasonable time, place, and manner restrictions, individuals have First Amendment right to photograph or videotape police conduct).

160.   Gathering information about government officials, as Mr. Peck did, "serves a cardinal First Amendment interest," particularly when it comes to "law enforcement officials, who are granted substantial discretion that may be misused to deprive individuals of their liberties." *Glik*, 655 F.3d at 82. "Ensuring the public's right to gather information about their officials not only aids in the uncovering of abuses but also may have a salutary effect on the functioning of government more generally." *Id.* at 82-83 (citation modified).

161.   It is also clearly established that "the right to protest racial discrimination" is protected by the First Amendment. *See, e.g., Connick v. Myers*, 461 U.S. 138, 148 n. 8 (1983) ("Mrs. Givhan's right to protest racial discrimination—a matter inherently of public concern—is not forfeited by her choice of a private forum.") (citing *Givhan v. Western Line Consol. School Dist., 439 U.S. 10 (1979); see also Jones v. Reagan*, 696 F.2d 551, 553 (7th

41

Cir. 1983) ("Although the Fifth Amendment has no equal protection clause, it has been held to forbid racial discrimination by the federal government to the same extent that the Fourteenth Amendment forbids racial discrimination by state governments.") (citing *Bolling v. Sharpe*, 347 U.S. 497 (1954)).

162.   Mr. Peck engaged in core First Amendment-protected activity when he sought to witness and document potential constitutional violations through his observation of the John Doe Defendants.

163.   The John Doe Defendants' threats to forcibly arrest Mr. Peck for engaging in that constitutionally protected activity were adverse actions that would likely deter a person of ordinary firmness from engaging in protected First Amendment activity.

164.   And the John Doe Defendants' actions did deter Mr. Peck from engaging in protected First Amendment activity.

165.   The statute cited by the John Doe Defendants to support their threat to arrest Mr. Peck for observing them, 18 U.S.C. § 111(a)(1), makes it a crime when someone "forcibly assaults, resists, opposes, impedes, intimidates, or interferes with any [federal employee] while engaged in or on account of the performance of official duties."

166.   The statutory term "forcibly" in 18 U.S.C. § 111(a)(1) modifies all the actions that follow, including "assaults" and "impedes." *See United States v. Charles*, 456 F.3d 249, 255 (1st Cir. 2006). It is settled law that 18 U.S.C.

42

§ 111 requires the government to prove beyond a reasonable doubt that the defendant acted "forcibly." *See, e.g.*, *United States v. Disney,* 253 F.3d 1211, 1214 (10th Cir. 2001) (district court erroneously found violation of § 111(a)(1) because defendant did not act forcibly).

167.    To convict a defendant under 18 U.S.C. § 111(a)(1), the government must also prove an assault, or a similar act of resisting, opposing, or impeding an officer. *United States v. Taylor*, 848 F.3d 476,493 (1st Cir. 2017).

168.    Proof of the element of "forcible" action can be met by a showing of either physical contact with the federal agent, or by "such a threat or display of physical aggression toward the officer as to inspire fear of pain, bodily harm, or death." *See, e.g., United States v. Rafidi*, 829 F.3d 437, 446 (6th Cir. 2016) (quoting *United States v. Chambers*, 195 F.3d 274, 277 (6th Cir. 1999)); *United States v. Schrader*, 10 F.3d 1345, 1348 (8th Cir. 1993).

169.    No reasonable federal law enforcement officer could possibly think that the mere following of a DHS vehicle at a safe distance by a person attempting to observe DHS's activities in their community constituted the crime of impeding under 18 U.S.C. § 111.

170.    The John Doe Defendants could not have reasonably believed that, by following their DHS vehicle at a safe distance in his vehicle for the

43

purpose of observing DHS's public activities, Mr. Peck committed the crime of impeding under 18 U.S.C. § 111.

171. By detaining and threatening to forcibly arrest Mr. Peck for a crime they could not reasonably have believed he was committing, the John Doe Defendants violated Mr. Peck's clearly established First Amendment rights and caused him harm. *See Jean v. Massachusetts State Police*, 492 F.3d 24, 33 (1st Cir. 2007) (arrest of plaintiff for publishing video of police activity was enjoined because it would violate First Amendment); *Am. Ass'n of Univ. Professors v. Rubio*, 802 F. Supp. 3d 120, 190 (D. Mass. 2025) (threats of arrests to chill speech violated the First Amendment); and *Damon v. Hukowicz*, 964 F. Supp. 2d 120, 151 (D. Mass. 2013) (threatening to unlawfully arrest plaintiff violated his rights).

172. The John Doe Defendants used the threat of physical force to intentionally interfere with Mr. Peck's First Amendment protected activities when, while armed and leaning on his car window, they threatened to "pull" him out of his car and arrest him if he ever followed them again.

173. The John Doe Defendants acted with the intent to put Mr. Peck in imminent apprehension of offensive physical contact. And the John Doe Defendants' actions in fact placed Mr. Peck in imminent apprehension of such a contact.

44

174. The John Doe Defendants' conduct would cause a reasonable person in Mr. Peck's circumstances to suffer emotional distress or to fear death or bodily injury.

175. When the John Doe Defendants detained and threatened Mr. Peck, they were acting within the scope of their employment and were implementing a plainly unconstitutional DHS policy and practice of intentionally misusing the threat of arrest and prosecution under 18 U.S.C. § 111 to terrify into submission people who oppose or criticize the Trump administration's racist and lawless tactics against immigrants of color.

176. "Federal officials do not possess discretion to violate constitutional rights." *Thames Shipyard & Repair Co. v. United States*, 350 F.3d 247, 255 (1st Cir. 2003) (citation modified) (quoting *Medina v. United States*, 259 F.3d 220, 225 (4th Cir. 2001)).

### Count II:
### Violation of the Fourth Amendment of the U.S. Constitution under 5 M.R.S. § 4682
### *Against the John Doe Defendants Only*

177. Plaintiff re-alleges the preceding allegations.

178. When the John Doe Defendants directed Mr. Peck to lower his car window and subjected him to questions about his activities, they engaged in an unconstitutional seizure in violation of his clearly established rights under the Fourth Amendment.

179. Under well-established and controlling case law interpreting the Fourth Amendment, before a law enforcement officer may stop and question someone, they must have a reasonable suspicion that "criminal activity is afoot." *United States v. Dapolito*, 713 F.3d 141, 147 (1st Cir. 2013) (officers lacked reasonable suspicion necessary to conduct even brief *Terry* stop).

180. Here, Mr. Peck did absolutely nothing to support a reasonable suspicion that he had engaged in unlawful activity. He was legally driving his car on a public street at a safe distance behind the John Doe Defendants' vehicle.

181. Thus, the John Doe Defendants intentionally interfered (or attempted to intentionally interfere) with Mr. Peck's exercise of his Fourth Amendment right to be free from unreasonable seizures.

182. The John Doe Defendants used the threat of physical force to effect a temporary seizure of Mr. Peck because, due to their physical armed presence next to his vehicle and order to put down his window, he reasonably believed that they would use physical force against him if attempted to leave before they finished speaking with him.

183. The John Doe Defendants' conduct would cause a reasonable person in Mr. Peck's circumstances to suffer emotional distress or to fear death or bodily injury.

184.   The John Doe Defendants detained Mr. Peck without reasonable suspicion or probable cause, and they had no lawful authority to confine him.

## Count III:
### Violation of the Federal Tort Claims Act
*Against Defendant United States of America Only*

185.   Plaintiff re-alleges the preceding allegations.

186.   At all relevant times, the John Doe Defendants acted under color of law and within the scope of their offices or employment as agents of DHS.

187.   The John Doe Defendants were also acting as investigative or law enforcement officers—that is, as officers of the United States who were empowered by law to execute searches, to seize evidence, or to make arrests for violations of federal law.

188.   The John Doe Defendants, whose conduct violated Mr. Peck's federal constitutional rights, committed multiple torts under Maine law against Mr. Peck : assault; battery; false arrest and imprisonment; intentional infliction of emotional distress; and negligent infliction of emotional distress.

189.   The John Doe Defendants committed the tort of assault because their intentional acts put Mr. Peck in imminent apprehension of offensive or harmful contact, namely an arrest and the physical (potentially violent) contact that goes along with an arrest by DHS agents.

47

190. John Doe Defendant One committed the tort of battery because he made intentional and nonconsensual physical contact with Mr. Peck's vehicle while Mr. Peck was inside of it.

191. The John Doe Defendants committed the tort of false arrest (also known as false imprisonment) because they unlawfully (in violation of the First and Fourth Amendments) confined Mr. Peck in his vehicle at the spot on the side of the road where he stopped. Mr. Peck could not have left his vehicle or that spot before the John Doe Defendants permitted him to do so without risking being arrested or physically harmed.

192. The John Doe Defendants committed the tort of intentional infliction of emotional distress because their intentional, extreme, and outrageous conduct caused Mr. Peck to suffer severe emotional distress.

193. In the alternative, to the extent Mr. Peck cannot satisfy the elements of the intentional torts discussed above, the John Doe Defendants committed the tort of negligent infliction of emotional distress. When the John Doe Defendants detained Mr. Peck, they owed him a duty of care that they breached with their unreasonable and unconstitutional conduct. And their unconstitutional conduct caused Mr. Peck to suffer severe emotional distress that was reasonably foreseeable.

194. A private person would be liable to Mr. Peck under like circumstances for these torts under Maine law.

195.    As a direct and proximate result of the John Doe Defendants' actions, Mr. Peck suffered the injuries described above.

196.    Defendant United States of America is thus liable under the FTCA for the acts of the John Doe Defendants who acted within the scope of their employment with DHS.

197.    Under the FTCA, the United States is entitled to assert any defense based upon "judicial or legislative immunity," but not executive immunity, which otherwise would have been available to the employee of the United States whose act or omission gave rise to the claim. 28 U.S.C. § 2674 ("With respect to any claim under this chapter, the United States shall be entitled to assert any defense based upon judicial or legislative immunity which otherwise would have been available to the employee of the United States whose act or omission gave rise to the claim, as well as any other defenses to which the United States is entitled.").

198.    Under Maine law, plaintiffs do not have to present medical evidence to recover monetary relief for emotional distress and similar harms. *Town of Stonington v. Galilean Gospel Temple*, 722 A.2d 1269, 1272 (Me. 1999) (emotional distress award affirmed for a plaintiff despite lack of medical evidence); *Gammon v. Osteopathic Hosp. of Maine, Inc.*, 534 A.2d 1282, 1285 (Me. 1987) (evidence of physical harm or "objective symptomatology" is not required to recover damages for emotional distress);

49

*Vicnire v. Ford Motor Credit Co.*, 401 A.2d 148, 154 (Me. 1979) ("In appropriate cases, 'severe' emotional distress may be inferred from the 'extreme and outrageous' nature of the defendant's conduct alone.").

## Relief Requested

Mr. Peck respectfully requests that this Court:

(a)     Declare that the John Doe Defendants violated Plaintiff's First and Fourth Amendment rights under the United States Constitution and the Maine Civil Rights Act[42];

(b)     Award Mr. Peck compensatory damages against the John Doe Defendants in amounts to be determined at trial by the jury and against Defendant United States in amounts to be determined at trial by the Court;

(c)     Award punitive damages against Defendants John Doe 1 and John Doe 2 (but not the United States) in amounts to be determined at trial by the jury;

(d)     Order the John Doe Defendants to indicate in any records they made or caused to be made regarding the John Doe Defendants' encounter with Mr. Peck that Mr. Peck's conduct was completely lawful and the John Doe Defendants' warning that he would be arrested if he followed federal

---

[42] This Court has the authority to issue a declaratory judgment under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, and the Maine Civil Rights Act.

agents' vehicles was unlawful and should not be used against Mr. Peck in any way;

(e)     Order the John Doe Defendants to undergo training on the correct scope of 18 U.S.C. § 111 and how to engage in law enforcement activities without violating individuals' First and Fourth Amendment rights;

(f)     Order the John Doe Defendants never again to threaten to arrest Mr. Peck based solely on his observation of the public actions of government agents or otherwise retaliate against him for exercising his First Amendment rights;

(g)     Award Mr. Peck reasonable attorney's fees (including litigation expenses and costs);

(h)     Award Mr. Peck nominal damages;

(i)     Award Mr. Peck prejudgment interest against the John Doe Defendants but not against the United States of America; and

(j)     Award such further relief as is deemed appropriate.

Respectfully submitted,

Date: August 3, 2026                    /s/ David G. Webbert
                                        David G. Webbert
                                        Johnson, Webbert & Beard, LLP
                                        1 Bowdoin Island Mill, Ste. 300
                                        Topsham, Maine 04086
                                        Telephone: (207) 623-5110
                                        dwebbert@work.law

51

/s/ Braden A. Beard
Braden A. Beard
Johnson, Webbert & Beard, LLP
1 Bowdoin Island Mill, Ste. 300
Topsham, Maine 04086
Telephone: (207) 623-5110
bbeard@work.law

/s/ Allan K. Towsend
Allan K. Townsend
Johnson, Webbert & Beard, LLP
1 Bowdoin Island Mill, Ste. 300
Topsham, Maine 04086
Telephone: (207) 623-5110
atownsend@work.law

/s/ Shelby Leighton
Shelby Leighton
Public Justice
1620 L St. NW, Suite 630
Washington, DC 20036
(202) 797-8600
sleighton@publicjustice.net

/s/ Ana M. Builes
Ana M. Builes
Public Justice
1620 L St. NW, Suite 630
Washington, DC 20036
(202) 797-8600
abuiles@publicjustice.net

*Attorneys for Plaintiff Robert C. Peck*

52