United States District Court
District Of Maine

Robert C. Peck,

Plaintiff,

v.

John Doe 1 et al.,

Defendants.

No. 2:26-cv-293-JAW

**PLAINTIFF'S OBJECTION**
**TO MOTION TO DISMISS OF DEFENDANT UNITED STATES**

**TABLE OF CONTENTS**


INTRODUCTION ........ 1

FACTS ........ 3

ARGUMENT ........ 6

I. Mr. Peck has plausibly pled the Maine tort claims of false arrest, assault, battery, intentional infliction of emotional distress, and negligent infliction of emotional distress under the FTCA. ........ 6

A. The order by an armed federal agent for Mr. Peck to lower his car window, without any lawful basis for a stop, states a plausible claim for false arrest ........ 7

1. Under controlling Law Court precedent, Mr. Peck has plausibly alleged that he was confined when an ICE agent ordered him to lower his car window ........ 7

2. Mr. Peck has plausibly alleged that the two ICE agents intended to confine him to his car when they ordered him to lower his window and then both threatened him with arrest for a federal crime. ........ 9

3. The ICE agents' arrest of Mr. Peck was not privileged ........ 11

B. The Complaint plausibly alleges the torts of assault and battery ........ 13

1. Battery: ICE Agent Lapointe's placement of his hand on Mr. Peck's car during the stop was an offensive contact with Mr. Peck's person. ........ 13

2. Assault: The threat of masked and heavily armed ICE agents to "pull you back out and arrest you" states a plausible claim of assault under the conditional threat doctrine ........ 14

a. The conditional nature of the agents' threats against Mr. Peck do not allow the United States to escape liability for the abuse of power by the ICE agents here 14

b. The Complaint plausibly alleges that Mr. Peck actually anticipated that harmful or offensive contact was imminent ........ 15

c. The ICE Agents' assault of Mr. Peck was not privileged. ........ 16

C. Intentional Infliction of Emotional Distress: The threat of a violent arrest by heavily armed and masked men states a plausible claim of outrageous conduct ........ 18

D. In the alternative, Mr. Peck states a plausible claim of Negligent Infliction of Emotional Distress Because the Key Factor of "Disparity of Power" Applies ........ 19

II. If the Court grants the United States' motion to substitute, Mr. Peck may pursue MCRA claims against the United States through the FTCA because MCRA explicitly makes private persons liable for violations of constitutional rights. ............................22

A. Mr. Peck could pursue his MCRA claims through the FTCA if the Court granted the United States' motion to substitute. ..................................................................23

B. Mr. Peck has sufficiently alleged violations of the First and Fourth Amendment....24

1. The Complaint states a plausible claim that Defendants Lapointe and Semler violated Mr. Peck's First Amendment rights ........................................................ 24

2. The Complaint states a plausible claim that Defendants Lapointe and Semler violated Mr. Peck's Fourth Amendment rights...................................................... 27

CONCLUSION........................................................................................................... 29

## Introduction

Defendant United States's motion to dismiss of (ECF No. 26; *Def. Mot. or Motion)* violates fundamental rules of civil procedure. **First**, it imperiously tells the Court (*Def. Mot.* 13)[1] that "for Counts I and II of the complaint, the two ICE officers have been replaced as Defendants by the United States" under the Federal Tort Claims Act (FTCA); the government treats this substitution as a fait accompli even though this Court and the First Circuit have repeatedly stated that the automatic substitution provision in the FTCA does *not* extend to constitutional tort claims. *See* ECF Nos. 29, 34. Because the government's motion regarding Counts I and II depends entirely on its erroneous assumption about automatic substitution, it should be denied.

**Second**, the government's Motion improperly relies on its interpretation of the facts in the First Amended Complaint (ECF No. 6; *Compl*. or *Complaint*) and the omission of facts it doesn't like. For example, it argues over and over that the two ICE agents felt they were in ever increasing "danger" of an "ambush" because they saw Mr. Peck following them even after they tried to "escape him." Def. Mot. at 9, 17, 19. No such facts appear in the Complaint.

Rather than confront the many non-conclusory facts in the Complaint that tell a different story, the government spins the complaint as much ado about nothing: an overreaction "to innocuous conduct" by ICE agents participating in what they euphemistically describe as "an increase in immigration enforcement activity around Portland, Maine." *Id*. at 9, 26. From the start, the government's telling of the facts (without any supporting citations) is heavily slanted in its favor so that it was the armed and masked agents, not Mr. Peck, who were threatened: "Following a person instills in the one followed a concern for safety and security." *Id*. at 8. The *Complaint*,

[1] For the purposes of this brief, all citations to the defendant's Motion to Dismiss are to the ECF stamped page numbers at the top of each page.

however, alleges detailed facts supporting a different interpretation: in its "Operation Catch of the Day," ICE was terrorizing Mainers, not the other way around.

And, at the motion-to-dismiss stage of a case, it is elementary that the Court must (1) treat all non-conclusory factual allegations in the complaint "as true, even if seemingly incredible" or "actual proof of those facts is improbable;" and (2) "draw all reasonable inferences in favor of the plaintiff."[2] By following the opposite approach here, the government has not provided a proper basis for the Court to even consider dismissal much less to order it.

**Third**, the Motion focuses on straw man claims that are not alleged in the Complaint. For example, it repeatedly attacks the notion that Mr. Peck's Fourth Amendment rights were violated because his decision "to stop his car behind the officers' unmarked SUV" was "not a seizure." *Def. Mot.* at 16. And it similarly challenges Mr. Peck's tort claim for false arrest because, "critically, he chose to stop his car on a public road." *Id.* at 22. The *Complaint*, however, alleges that the seizure and false arrest occurred when the ICE Agents approached his parked car and ordered him to lower the window and not when he first stopped. *See Compl.* ¶¶ 182, 191.

Because the Motion blatantly violates the governing rules, the Court should deny it.[3] Besides, as demonstrated below, the government's legal arguments lack merit.

---

[2] *Ocasio-Hernandez v. Fortuno-Burset*, 640 F.3d 1, 12 (1st Cir. 2011) (citation modified); *N.R. by & through S.R. v. Raytheon Co.*, 24 F.4th 740, 746 (1st Cir. 2022). The United States has moved to dismiss Mr. Peck's Complaint under Rules 12(b)(1) and 12(b)(6). The "same basic principles" apply to both. *Harper v. Rettig*, 46 F.4th 1, 5 (1st Cir. 2022). Even if Mr. Peck's ultimate chances of success are "very remote and unlikely," the Court should deny the motion. *Ocasio-Hernandez*, 640 F.3d at 12-13.

[3] *See, e.g., Liberty Env't Sys., Inc. v. Cnty. of Westchester*, No. 94 CIV. 7431 (WK), 1995 WL 733593, at *3 (S.D.N.Y. Dec. 11, 1995) ("Because defendant's motion ignores the favorable factual inferences governing a Rule 12(b)(6) motion and instead seeks to argue the factual merits of plaintiffs' claims, the motion is denied."). *See generally Dietz v. Bouldin*, 579 U.S. 40, 47 (2016) ("[D]istrict courts have the inherent authority to manage their dockets and courtrooms with a view toward the efficient and expedient resolution of cases.").

**Facts**

January 2026 was a dark time in the recent history of Maine and our Nation. On January 7, 2026, a series of increasingly violent invasions of our cities by federal immigration agents bent on capturing and disappearing people of color led to their fatal shooting of a peaceful legal observer, Renee Good, in her car, *Compl.*19 fn. 13. On January 20, masked and armed ICE agents poured into greater Portland in what ICE touted as its "Operation Catch of the Day." *Compl.* ¶ 27. Plaintiff Robert Peck was one of many Mainers who took to the streets of his neighborhood to peacefully and safely observe and record these secret police. *Id.* ¶¶ 5-6, 9. He did so because he feared that, like ICE agents elsewhere in the country, they would use excessive force to capture and disappear immigrants without due process. *Id.* ¶ 10. He wanted to see for himself what ICE was doing in his community and to stand up for the fair treatment of his neighbors. *Id.* ¶ 11.

On the morning of January 22, 2026, Mr. Peck was at home in South Portland when he heard whistles and car horns signaling that ICE agents were outside, near the Mexican restaurant across the street. *Id.* ¶ 47. He went outside and learned that an ICE vehicle was nearby. *Id.* ¶ 48. When he saw agents drive away in an unmarked SUV, he followed them in his own car to see what they were doing and to document any violations of his neighbor's rights. *Id.* ¶¶ 49-50. He kept a safe distance the whole time, leaving at least one car between himself and the agents' vehicle. *Id.* ¶¶ 51-52. After seeing the agents' SUV unlawfully and dangerously speed through a red light, he eventually lost sight of it in the adjacent town of Scarborough. *Id.* ¶¶ 53-54.

So he went to the nearby ICE field office in Scarborough where he saw another SUV pull out and he followed it. *Id*. ¶¶ 54-55. Mr. Peck observed it go through a red light to turn left on Route 1 but he stopped and temporarily lost sight of it. *Id*. ¶ 58. He eventually regained sight of the black SUV while always keeping a safe distance, with one car between them. *Id*. ¶¶ 56-57.

When the black SUV vehicle turned onto a side road and stopped, Mr. Peck parked a safe distance away to observe it. *Id.* ¶¶ 63-65. As a video that Mr. Peck recorded shows, his parked vehicle was in no way obstructing the ICE agents' parked SUV or their freedom of movement. ECF No. 6-1, *Compl.* ¶ 65. He never made any form of threat or display of aggression toward the black SUV or the ICE agents who were in that vehicle. ECF No. 6-1, *Compl.* ¶¶ 7-157.

Two ICE agents, now identified as Defendants Nicholas Lapointe and Christopher Semler, got out and walked to his car. *Id.* at 17 ¶ 66; *see also* ECF No. 22 (identifying John Doe 1 as Lapointe and John Doe 2 as Semler). Mr. Peck then began recording them. *Id.* ¶ 69. They wore masks over their faces and tactical vests marked "POLICE;" they also had weapons and ammunition strapped to their vests and handguns on their belts. *Compl.* ¶¶ 67-68.

Lapointe ordered Mr. Peck to lower his window, and he complied, afraid they would break his window or use force if he did not. *Id.* ¶¶ 70-72; ECF No 6-1 0:00-0:02. He knew that about two weeks earlier, ICE agents in Minneapolis had killed Renee Good, a neighborhood observer like him, in her car. *Id.* at 19 ¶ 75. Mr. Peck also knew that during the prior week in Minneapolis four ICE agents dragged Aliya Rahman, a U.S. citizen on her way to a medical appointment, from her car and carried her face down while she cried for help. *Id.* at 20 ¶ 77.

Lapointe asked Mr. Peck if he was following them and, when he said yes, admonished him that following them was "called impeding federal law enforcement," which Lapointe falsely claimed was a felony under "18 USC charge 111." *Id.* ¶¶ 12, 78-79; ECF No. 6-1 0:06-0:15. In truth, Section 111 prohibits only "forcibly" impeding federal employees. 18 U.S.C. § 111(a)(1); *Compl.* ¶¶ 165-171. It does not cover members of the public, like Mr. Peck, peacefully observing law enforcement from a safe distance. 18 U.S.C. § 111(a)(1); *Compl.* ¶¶ 165-171.

Lapointe then pointed his finger at Mr. Peck while sternly reprimanding him that this was his "first and only warning" and that he would be arrested if he did it again. *Compl.* at 20 ¶ 80;ECF 6-1 at 0:15-0:19 ("If you continue to impede us and follow us, you will be arrested."). When Mr. Peck responded to Lapointe that he was "not impeding you, Semler pointed his finger at Mr. Peck and said, "you just openly admitted you were following us." *Compl.* ¶¶ 81-82; ECF 6-1 0:19-0:26. Mr. Peck then replied that he was following not impeding; "I'm observing you." Semler quickly replied, "it is impeding," and Mr. Peck then responded, "No, it's actually not." *Compl.* ¶¶ 83-84; ECF 6-1 0:22-0:28.

Semler then escalated Lapointe's prior threat of arrest, emphasizing that merely observing them would immediately trigger not just an arrest but a forcible one at that: "That's your one warning, if you keep doing it, **we'll pull you back out** and arrest you." *Compl.* ¶ 86 (emphasis added); ECF 6-1 0:27-0:31. This threat of a forcible arrest only came after Mr. Peck challenged the agents' unlawful attempt to criminalize and obstruct his peaceful observing activities.

While ordering Mr. Peck to stop observing them, Lapointe repeatedly rested his hand on Mr. Peck's car door, next to the open window, making clear to Mr. Peck, along with the other displays of authority, that he could not end the encounter or drive away. *Compl.* ¶¶ 70, 78-87; ECF 6-1. Indeed, two weeks earlier an ICE agent shot Ms. Good to death when she started to drive away while an agent's hands were on her vehicle. *Compl.* p. 23 fn. 17 (video linked in cited article). ICE's recent history of unnecessarily violent arrests, and the two agents' tone, aggressive pointing, intimidating body language, and explicit threat to "pull [him] back out," all combined to make Mr. Peck reasonably fear that they were about to grab him through the window, forcibly arrest him, inflict serious physical injuries, and have him charged with a federal crime under Section 111. *Compl.* at 21-23 ¶¶ 86-95; ECF 6-1.

At age 67, Mr. Peck worried that he would suffer serious harm if the federal agents forcibly arrested him, especially because he had several pre-existing injuries. *Compl.* ¶ 94. Because he didn't feel free to leave, Mr. Peck felt like a sitting duck and did everything he could to stay calm and not inadvertently give the DHS agents any excuse to brutalize him. *Id.* ¶¶ 94-95.

When Mr. Peck finally got safely away from the ICE agents, he began shaking so badly that he could not operate his phone. *Id.* at 24 ¶ 99. He completely stopped his First Amendment activity of observing DHS agents in their vehicles. *Id.* ¶¶ 103, 132. Reminders of his detention by ICE trigger physical symptoms, and he continues to suffer from anxiety and severe insomnia. *Id.* ¶¶ 147-49. Some family and friends asked him not to park near their home or not visit them at all, for fear that his visits would draw ICE's attention to them. *Id.* ¶ 108.

## Argument

Mr. Peck sued the United States under the FTCA based on the common law torts committed by its two ICE agents. *Id.* ¶¶ 185-98. Separately, he brought claims against Lapointe and Semler individually under the MCRA for violating his First and Fourth Amendment rights. *Id.* ¶¶ 158-84. Of course, "at the motion-to-dismiss stage, Plaintiff must allege only sufficient factual matter to state a claim to relief that is plausible on its face." *Garayalde-Rijos v. Municipality of Carolina*, 747 F.3d 15, 23 (2014) (citation modified).

### I. Mr. Peck has plausibly pled the Maine tort claims of false arrest, assault, battery, intentional infliction of emotional distress, and negligent infliction of emotional distress under the FTCA.

The United States is liable for the torts of false arrest, assault, battery, intentional infliction of emotional distress, and negligent infliction of emotional distress by its ICE agents against Mr. Peck. Under the FTCA, the United States is liable for torts committed by its employees "in the same manner and to the same extent as a private individual under like circumstances." 28 U.S.C.

§ 2674. Because Lapointe's and Semler's "tortious conduct took place in Maine," this Court must apply Maine tort law to decide the FTCA claims. *Palmer v. United States*, No. 1:23-CV-00027-SDN, 2025 WL 1177223, at *6 (D. Me. Apr. 23, 2025) (citing 28 U.S.C. § 1346(b)(1) and *Lozada-Manzano v. United States*, 75 F.4th 31, 38 (1st Cir. 2023)).

**A. The order by an armed federal agent for Mr. Peck to lower his car window, without any lawful basis for a stop, states a plausible claim for false arrest.**

Mr. Peck has alleged a plausible claim for false arrest under Maine law because Agents Lapointe and Semler intended to confine him in his vehicle when they ordered him to lower the window, asserted false legal authority, and engaged in "explicit or implicit threats of physical force" and other "means of duress." *Smith v. Heritage Salmon, Inc.,* 180 F. Supp. 2d 208, 220 (D. Me. 2002) (citing *McCann v. Wal–Mart Stores, Inc*., 210 F.3d 51, 53 (1st Cir.2000) (citing Restatement (Second) of Torts, § 35 (Am. Law Inst. 1965)).[4] The government incorrectly argues that a plausible claim of false arrest has not been alleged because (1) Mr. Peck was not confined; (2) the ICE agents did not act with intent to confine him; and (3) their actions were privileged. *Def. Mot.* 21-28.

**1. Under controlling Law Court precedent, Mr. Peck has plausibly alleged that he was confined when an ICE agent ordered him to lower his car window**.

The Law Court has ruled that a police officer asking the driver of a car to "please roll down the window" constituted a seizure under the Fourth Amendment. *State v. Patterson*, 2005 ME 26, ¶ 6, 868 A.2d 188, 190.[5] And the Law Court treats "the analysis of the state law claim[] of illegal arrest . . . the same as for the federal law claim[]" under the Fourth Amendment. *Blackstone v.*

---

[4] Mr. Peck agrees with Defendant (Def. Mot. 21) that, under Maine law, "false arrest is but one means of committing false imprisonment," *Jedzierowski v. Jordan*, 157 Me. 352, 353, 172 A.2d 636, 637 (1961).

[5] In *Patterson*, the Law Court noted that two other courts had ruled the same way. *Id*. at ¶ 16 (citing "*Borowicz v. North Dakota Dep't of Transp*., 529 N.W.2d 186, 188 (N.D.1995) (stating that stop arguably occurred when officer's instruction to open the door could be interpreted as an order); [and] *Ebarb v. State*, 598 S.W.2d 842, 850 (Tex.Crim.App.1979) (holding that officer's order to roll down window or open door creates a temporary seizure.").

*Quirino*, 309 F.Supp.2d 117, 129 (D. Me. 2004) (quoting *Richards v. Town of Eliot*, 780 A.2d 281, 292 (Me. 2001)). Thus, the holding in *Patterson* about what constitutes a seizure under the Fourth Amendment precludes the government's argument here that Agent Lapointe's order for Mr. Peck to lower his window is insufficient to provide plausible support for a false arrest claim under Maine tort law. *See also United States v. Ingram*, 151 F. App'x 597, 598 (9th Cir. 2005) (officer seized defendant when he ordered defendant to lower his car window); *United States v. Carroll*, 591 F.2d 1132, 1135 (5th Cir. 1979) (tapping on window of parked vehicle and asking driver questions constituted a seizure).

And the United States relies on a red herring when it argues that Mr. Peck was not confined because he stopped his own vehicle. *Def. Mot.* 22. Whether a false arrest has occurred turns on whether the plaintiff was confined by the defendant, not whether he was initially stopped by that same actor. *See* Restatement (Second) of Torts § 35 (False Imprisonment). The Complaint does not allege that Mr. Peck was confined when he voluntarily parked his car but rather that he was confined "in his vehicle" by Agents Lapointe and Semler once they approached his vehicle, ordered him to lower his window, and then read him the riot act punctuated with a direct threat of forcible arrest for following them. *Compl.* ¶ 191.

The government also falsely asserts a length of time requirement as part of the definition of the confinement element. It is fundamental, however, to the rationale for liability for false arrest that a total restraint on the liberty of the person, for no matter how short a time, is sufficient. *See* Restatement (Third) of Torts § 7 cmt. b (Am. Law Inst. 2021) (quoting *Bird v. Jones,* (1845) 115 Eng. Rep. 668 (Patteson, J.)).

The false arrest element of "confinement can also be based on a false assertion of legal authority to confine." *McCann v. Wal-Mart Stores, Inc.*, 210 F.3d 51, 53 (1st Cir. 2000). Here, two

heavily armed and masked ICE agents approached Mr. Peck's car; then one of them told him to lower his window and then kept his hand on Mr. Peck's car while he and the other agent both gave Mr. Peck final warnings that he would be arrested if he kept following them. *See* ECF 6-1. These specific allegations, which are verified by Mr. Peck's video, are more than sufficient to support a plausible inference of confinement by the ICE agents through the assertion of false legal authority.

Despite First Circuit authority to the contrary, the government relies on *Knowlton v. Ross*, 95 A. 281, 283 (Me. 1915), to support its argument that Mr. Peck was not confined because its ICE agents allegedly "imposed no boundaries on Mr. Peck." Def. Mot. 22. In *McCann*, 210 F.3d at 54, the First Circuit specifically rejected the "actual, physical restraint" language in the "elderly" *Knowlton* case as of "an entirely improbable breadth" that was no longer binding law.

**2. Mr. Peck has plausibly alleged that the two ICE agents intended to confine him to his car when they ordered him to lower his window and then both threatened him with arrest for a federal crime.**

Lapointe and Semler, who were masked and heavily armed, came to Mr. Peck's car, instructed him to lower his window, and repeatedly (a) falsely accused him of violating 18 U.S.C. § 111; and (b) threatened to forcibly arrest him for that purported federal crime. ECF 6-1 at 0:08-0:18. But no reasonable agent could have believed Mr. Peck was committing that crime merely by following them at a safe distance. *Compl.* ¶¶ 169-70. It is at least plausible to infer that Lapointe and Semler knew that their threats and assertions of legal authority restrained Mr. Peck's liberty to leave the scene until they departed. Restatement (Second) of Torts § 40 ("The confinement may be by submission to a threat to apply physical force to the other's person immediately upon the other's going or attempting to go beyond the area in which the actor intends to confine him.").

Even assuming for the sake of argument that the assertion of false legal authority and explicit threat of physical force were insufficient to support a plausible inference of intent to

confine, the broader context of Mr. Peck's interaction with the ICE agents, along with their demeanor and conduct throughout the detention, created an implicit threat of physical force sufficient to find that they intended to confine him. Restatement (Second) of Torts § 40 cmt. a. ("[T]he actor's threat may be by words as well as by other acts."); *McCann*, 210 F.3d at 53 (settled law that implicit or explicit threats can be the basis of confinement). The ICE agents were masked and heavily armed; their tone was combative and body language was hostile while they repeatedly touched Mr. Peck's car and pointed at him while giving him stern warnings that he was engaging in criminal activity that must stop or else he would be arrested. *See* ECF 6-1. In short, their appearance, words, and actions combined make it plausible to infer that they intended to imply that if Mr. Peck attempted to leave before they were finished warning him, they would immediately use physical force against him.

These threats by the two ICE agents against Mr. Peck took place against a backdrop of ICE's recent use of physical force in similar circumstances against civilians they perceived as not fully or docilely enough submitting to their authority. *Compl.* ¶¶ 75-77, 88-91. Just two weeks prior, it was a leading national news story for days that an ICE agent had shot dead Renee Good, purportedly for attempting to leave a roadside encounter without permission. *Compl.* ¶ 75. Agents Lapointe and Semler must have known (and it is certainly plausible that they knew) that their conduct would result in Mr. Peck's confinement for the duration of their interaction. *Def. Mot.* 23. Indeed, if the agents had been two masked, visibly armed private individuals approaching Mr. Peck' parked vehicle and directing him to lower his window, the same implied threat of physical violence would warrant a plausible inference of confinement. *See* Restatement (Second) of Torts § 35 cmt. d (the intent to confine prong of false arrest is met when the tortfeasor's "act was done for the purpose of imposing confinement upon the **other or with knowledge that such**

**confinement would, to a substantial certainty, result from it**") (emphasis added); *see generally* ECF 6-1.

**3. The ICE agents' arrest of Mr. Peck was not privileged.**

The government's sole argument that the ICE agents' confinement of Mr. Peck was privileged is based on a provision of the ICE regulations that allows an "immigration officer to briefly detain [a] person for questioning" but only if the officer "has a reasonable suspicion, based on specific articulable facts, that the person being questioned is, or is attempting to be, engaged in an offense against the United States." *Def. Mot.* 28 (citing C.F.R. § 287.8 (b)). This regulation tracks the requirements of the Fourth Amendment, which has long been interpreted to allow a "brief investigatory stop" of an individual if the officer can establish he had "a particularized and objective basis for suspecting the person stopped of criminal activity." *United States v. Espinoza*, 490 F.3d 41, 47 (1st Cir. 2007) (citation modified). To comply with the Fourth Amendment, the officer must point to "specific and articulable facts" to support his suspicion, *id.*, and not an "inchoate and unparticularized suspicion or 'hunch.'" *Terry v. Ohio*, 392 U.S. 1, 27 (1968). And "the objective nature of the inquiry" mandates that courts "focus not on what the officer himself believed but, rather, on what a reasonable officer in his position would have thought." *Espinoza*, 490 F.3d at 47. Thus, under the Fourth Amendment, it is not enough for the police to have safety concerns "untethered to a reasonable suspicion of criminal activity," before conducting an investigatory stop. *United States v. Dorlette*, 706 F. Supp. 2d 290, 299 (D. Conn. 2010).

Applying these well-established principles, a district court in Minnesota recently held that following ICE agents' vehicles "at an appropriate distance does not, by itself, create reasonable suspicion to justify a vehicle stop." *Tincher v. Noem*, 816 F. Supp. 3d 931, 983–84 (D. Minn. 2026). In *Tincher*, the government made the same argument it makes here that, when the plaintiffs

followed ICE agents' vehicles, the ICE agents had reasonable suspicion the plaintiffs were or were about to forcibly impede their activities in violation of 18 U.S.C. § 111. *Id.* at 975. The plaintiffs in *Tincher* had "observed an unmarked vehicle that they believed to be federal law enforcement; [and] they followed the vehicle while driving lawfully and keeping a reasonable distance. *Id.* The court held these plaintiffs' actions did not create any reasonable suspicion of a violation of 18 U.S.C. § 111, which requires "forcible interference with or impeding of federal law enforcement officers in the course of their duties." *Id.* Mr. Peck engaged in essentially the same actions as the plaintiffs in *Tincher* and thus this Court should adopt the persuasive reasoning and conclusion of the *Tincher* court.

"Even if the actor believes the confinement is lawful based on a privilege to intentionally confine the plaintiff, the actor is subject to liability if that belief is mistaken and unreasonable." Restatement (Third) of Torts § 7 cmt. c. Although Agents Lapointe and Semler may have believed they were privileged to confine Mr. Peck for a violation of 18 U.S.C. § 111, that belief was, at least plausibly, mistaken and unreasonable. 18 U.S.C. § 111 prohibits "forcibly" impeding or interfering with federal agents' activities. *See Compl.* ¶ 166-70. Mr. Peck was in no way *forcibly* impeding or interfering with Agents Lapointe and Semler's activities. *See generally Def. Mot.* 19. So the Complaint alleges sufficient facts to make it at least plausible that ICE agents' mistaken belief that they had lawful grounds to confine Mr. Peck was unreasonable and, therefore, not privileged. *See Compl.* ¶¶ 12, 168.

Although the Court need not reach the issue here, Defendant is wrong in asserting that the FTCA allows the ICE agents here to invoke a special privilege based solely on their status as law enforcement. *Def. Mot.* 31. This argument is directly contrary to the plain meaning of the FTCA's statutory scheme. As Defendant concedes, the FTCA makes the United States "liable for its

employees' torts **only** "in the same manner and to the same extent as a private individual under like circumstances." *Def. Mot.* 20 (emphasis added; quoting 28 U.S.C. § 2674 and citing *Rayonier Inc. v. United States*, 352 U.S. 315, 318-19 (1957) as "holding that FTCA waiver depends not on whether firemen 'acted[ed] as public firemen,' but rather on 'whether a private person would be responsible for similar negligence' under local law").

**B. The Complaint plausibly alleges the torts of assault and battery.**

**1. Battery: ICE Agent Lapointe's placement of his hand on Mr. Peck's car during the stop was an offensive contact with Mr. Peck's person.**

It is long settled under the common law that, for the tort of battery, the touching of another's car while that person is inside is considered contact with his person. *See, e.g., Watkins v. Davis*, 156 F.4th 1084, 1102 (11th Cir. 2025) (relying on common law battery cases regarding the touching of horses and carriages to support holding that law enforcement officer "touching a car with a driver inside it also amounts to the 'force' necessary to effect a seizure of the driver")); *People v. Dealba*, 242 Cal.App.4th 1142, 1152-53 (Cal. Ct. App. 2015) (contact of defendant's car with plaintiff's car was sufficient to support offensive touching element of battery); *Kelly v. County of Monmouth*, 883 A.2d 411, 415 (N.J. Super. Ct. App. Div. 2005) (quoting Prosser and Keeton, *The Law of Torts* (5th ed., 1984) § 9 at 39-40) (liability for non-consensual touching extends "'to anything which is attached to [the body] and practically identified with it'" including "'the horse or the car [which] the plaintiff rides or occupies'").

All that is required to prove a claim of battery under Maine law is that the actor acts intending to cause a harmful or offensive contact with another and that "an offensive contact with the person of the other directly or indirectly results." Restatement (Second) or Torts § 18; *see also Albert v. Nason*, No. CV-18-167, 2022 WL 17811313, at *3 (Me. Super. July 25, 2022); *Cliff v. Thibodeau*, No. Civ.A. CV–01–82, 2002 WL 31546082, *2 (Me. Super. Aug. 12, 2002). And even

the "least touching of another" constitutes battery in Maine. *Cole v. Turner*, 6 Mod. Rep. 149 (1704); *see also Estate of Berthiaume v. Pratt*, 365 A.2d 792, 793-94, 796 (Me. 1976) (slight non-consensual touching of patient's head by doctor constituted a battery because it invaded patient's right to be let alone). "[T]he law is so careful of personal rights, and of life and limb, that even a slight touch of a man's person, in a wanton, willful, and insulting manner" is made a battery. *Wadsworth v. Treat*, 43 Me. 163, 165 (1857) (quotation omitted). The placement of a heavily armed and masked law enforcement agent's hand on one's car, mere feet from one's body, while that agent unconstitutionally threatens to arrest you for a federal crime you did not commit, would plausibly offend a reasonable sense of personal dignity. Restatement (Second) of Torts § 18 cmt. c (stating that all that is necessary to find an offensive contact is that the individual reasonably regards the tortfeasor's contact as offensive). "Since the essence of the plaintiff's grievance consists in the offense to the dignity involved in the unpermitted and intentional invasion of the inviolability of his person and not in any physical harm done to his body, it is not necessary that the plaintiff's actual body be disturbed." *Id.*

**2. Assault: The threat of masked and heavily armed ICE agents to "pull you back out and arrest you" states a plausible claim of assault under the conditional threat doctrine.**

**a. The conditional nature of the agents' threats against Mr. Peck do not allow the United States to escape liability for the abuse of power by the ICE agents here.**

"If the actor intentionally puts another in apprehension of an imminent and harmful or offensive contact, he is subject to liability for an assault although he gives to the other the option to escape the contact by obedience to a command given by the actor." Restatement (Second) of Torts § 30 (Conditional Threat); *see also Gouin v. Gouin*, 249 F.Supp.2d 62, 70 (D. Mass. 2003) (wife successfully stated claim for assault when her husband said "'[y]ou can either do it my way

or I can beat you half to death'" and he knowingly acted to instill "fear of imminent harm" in wife if she did not comply with his wishes).

Here, the ICE agents told Mr. Peck: "If you keep [following us], we'll pull you back out and arrest you." ECF 6-1 0:29-0:31. Just because the agents provided Mr. Peck with a means of avoiding arrest, does not allow the agents to escape liability for their threat of a violent arrest.

Nor is the United States's reliance on Restatement (Second) of Torts § 29 cmt. c persuasive. *Def. Mot.* 31 (quoting Restatement (Second) of Torts § 29 cmt. c which states, "A threatens to shoot B and leaves the room with the express purpose of getting his revolver. A is not liable to B."). As described above, the ICE agents' words together with the accompanying circumstances placed Mr. Peck in reasonable apprehension that they might use physical force to remove him from his car or even kill him, at any time during the encounter, as ICE agents did in the cases of Reneé Good and Aliya Rahman. *Compl.* ¶¶ 77, 90. Moreover, unlike the facts of this case, that example did not contain a conditional threat. Restatement (Second) of Torts § 29 cmt. c.

**b. The Complaint plausibly alleges that Mr. Peck actually anticipated that harmful or offensive contact was imminent.**

All that is required to find assault under Maine common law is that a tortfeasor "acts intending to cause a harmful or offensive contact with the person of the other or a third person, or an imminent apprehension of such contact", and "the other person is thereby put in such imminent apprehension." *Liberty v. Bennett*, No. CV-03-421, 2007 WL 4692881, at *10 (Me. Super. Jan. 29, 2007); *see also Albert v. Nason*, No. CV-18-167, 2022 WL 17811313, at *3 (Me. Super. July 25, 2022); Restatement (Third) of Torts § 5 cmt. d. (To find assault, all that must be considered is "whether the person actually anticipated an imminent harmful or offensive contact." Because "a subjective standard applies," it is immaterial "whether a reasonable person or a person of ordinary ability or courage would have experienced such anticipation."). The allegations in the *Complaint*

about the threats the ICE agents made against Mr. Peck, his_knowledge of prior recent incidents of violence by ICE and the ICE agents' hostile and intimidating tone and body language (including finger pointing and putting hand on his car) are more than sufficient to infer that Mr. Peck subjectively anticipated that the agents would imminently use harmful physical force against him if he did not comply with their demands. *See Compl.* ¶¶ 70, 72, 77,_79-80, 85-90;. *see also* Restatement (Third) of Torts § 5 cmt. g (Role of words) (words "together with other acts or circumstances" that "cause the other to reasonably anticipate that a harmful or offensive contact is imminent" are sufficient to "subject an actor to liability for assault."); Restatement (Second) of Torts § 31 cmt. d (Threat by Words) (recognizing that, depending on the circumstances in which they are uttered, words alone may be sufficient to find liability for assault).

**c. The ICE Agents' assault of Mr. Peck was not privileged.**

Defendants argue that Mr. Peck's assault and battery claims are subject to the law enforcement privilege under Maine law. But even if that privilege were applied, despite the FTCA's language, 28 U.S.C § 2674, prescribing liability to be determined "in the same manner and to the same extent of a private individual under like circumstances," the law enforcement privilege under Maine law's requirement of a false arrest is met here. As explained above, ICE Agents Lapointe and Semler conducted a false arrest; they had no lawful authority to detain Mr. Peck. And Mr. Peck violated no law nor did the agents "have reasonable, articulable suspicion that" Mr. Peck had, was, or was "about to be engaged in criminal activity." *U.S. v. Beauchamp*, 659 F.3d 560, 569 (6th Cir. 2011).

Although the plausible allegations of false arrest make it unnecessary for the Court to reach the issue, there is no special law enforcement privilege under the FTCA. Rather, the relevant inquiry is whether Maine tort law would hold a private individual liable for his tortious conduct,

not whether a law enforcement officer would be held liable for that same conduct. *See Black Lives Matter D.C. v. United States*, 775 F. Supp. 3d 241, 264 (2025) (concluding that complaint sufficiently stated claims for assault and battery under D.C. common law and, therefore, denying the government's motions to dismiss the assault and battery claims against police officers under the FTCA). When a private person is held liable for the torts of assault and battery in Maine, there is no requirement that the force used be excessive or that the private individual have conducted a false arrest.

Defendant cites *Santoni* for the general proposition, which Mr. Peck does not contest, that "[u]nder Maine law, the torts of assault and battery by a law enforcement officer require either a false arrest or the use of excessive force during or after taking an individual into custody." *Def. Mot.* at 31 (citing *Santoni*, 369 F.3d at 603). But *Santoni* held that plaintiff failed to state a claim for assault or battery based on the defendant's participation in his arrest "[b]ecause Santoni's arrest was lawful." 369 F.3d at 603. And the Santoni Court saw no need for further explanation because it had "already concluded, *supra*, that "Santoni was arrested and confined upon valid state law authority." By contrast, Mr. Peck's claims for assault and battery are not barred by any finding that his arrest or *Terry* stop was lawful. Thus, *Santoni* is not on point here.

Besides, Santoni reaffirms that "under the FTCA, the USPS is liable for the torts of its agents, 'in the same manner and to the same extent of a private individual under like circumstances.'" 369 F.3d at 603 (quoting 28 U.S.C. § 2674). *see also McDermott v. Town of Windham*, 204 F.Supp.2d 54, 72 (D. Me. 2002) (tort of assault and battery by a police officer is a distinct tort).

**C. Intentional Infliction of Emotional Distress: The threat of a violent arrest by heavily armed and masked men states a plausible claim of outrageous conduct.**

Although the government asserts that Mr. Peck has not satisfied any of the elements of a claim for intentional infliction of emotional distress (IIED), it makes specific arguments only as to the extreme and outrageous conduct prong, *Def. Mot.* 33, and thus waives its objections to the other prongs. *See, e.g., United States v. Ekasala*, 596 F.3d 74 (1st Cir. 2010) (ruling that "argument, which is raised in a single conclusory sentence, is effectively waived"). Under Maine law, severe emotional distress may be inferred from the extreme and outrageous nature of the defendant's conduct alone. *Latremore v. Latremore*, 584 A.2d 626, 633 (Me 1990) (quoting *Vicnire v. Ford Motor Credit Co.*, 401 A.2d 148, 154 (Me. 1979)).

Here, the video of the ICE agents is sufficient to support a plausible claim that their conduct was extreme and outrageous. Their abuse of police powers represented a breakdown in the rule of law and must be utterly intolerable in a civilized community. *See Gurski v. Culpovich*, 540 A.2d 764, 766 (Me. 1988). They exploited their position of governmental authority to terrorize Mr. Peck, repeatedly threatening him with physical violence and felony arrest, when he was exercising his First Amendment rights and clearly breaking no law. And they acted with the specific aim of frightening Mr. Peck so thoroughly that he would be unable to drive without fear of being forcibly arrested. ECF 6-1 0:29-0:31; *see also Cote v. Town of Millinocket*, 901 F.Supp.2d 200, 248 (D. Me. 2012) (concluding police officers' conduct was extreme and outrageous when they stopped plaintiff without probable cause and used excessive force against him).

Whether an actor's conduct is extreme and outrageous depends on the specific facts of each case. Where reasonable people "could differ as to the outrageousness of the defendant's conduct, it is for the jury to determine whether the conduct was sufficiently extreme and outrageous to result in liability." *Rubin v. Matthews Int'l. Corp.*, 503 A.2d 694, 699 (Me. 1986); *see also Johnson v.*

*Hawe*, 388 F.3d 676 (9th Cir. 2004) (holding, under Washington state law, that claim for intentional infliction of emotional distress was adequate to go to jury based on police officer's conduct of arresting plaintiff for recording communications for which there was no reasonable expectation of privacy).

One of the key factors supporting a finding that a defendant's conduct meets the extreme and outrageous prong applies here: "whether the actor abused a position of authority over the other person." *Howland v. Ellevet Sciences Inc.*, 2:24-cv-00442-JCN, slip op. at 22 (D. Me. Mar. 16, 2026). Unidentified, masked, heavily armed individuals, threatening law-abiding civilians on the side of the road plausibly states a claim of conduct that goes far beyond what should be tolerated in a civilized society. Indeed, far less has been found to constitute extreme and outrageous conduct under Maine law. *See Latremore*, 584 A.2d at 630 (concluding that son's attempt to evict parents in conjunction with attempt to have father declared mentally incompetent was extreme and outrageous conduct); *Howland*, slip op. at 24-25 (concluding that conduct designed to demean, humiliate, belittle, disrespect, and intimidate Plaintiff precluded summary judgment on IIED claim because jury could reasonably find that such conduct was sufficiently extreme and outrageous to result in liability); *Rubin*, 503 A.2d at 696, 699 (concluding that complaint sufficiently set forth conduct upon which liability for IIED may be predicated where company repeatedly lied about when memorial stone would be delivered).

**D. In the alternative, Mr. Peck states a plausible claim of Negligent Infliction of Emotional Distress Because the Key Factor of "Disparity of Power" Applies.**

If this Court finds in favor of Mr. Peck on one or more of his tort claims outlined above, it is unnecessary to reach the issue whether Lapointe and Semler negligently inflicted emotional distress on Mr. Peck. *See Curtis v. Porter*, 784 A.2d 18, 26 (Me. 2001) ("[W]hen [a] separate tort at issue allows a plaintiff to recover for emotional suffering, the claim for negligent infliction of

emotional distress is usually subsumed in any award entered on the separate tort"). Nonetheless, Mr. Peck has plausibly pled a claim for Negligent Infliction of Emotional Distress (NIED).

The government challenges this claim on only one ground: that Mr. Peck has failed to plausibly allege any duty of care owed to him by Agents Lapointe and Semler because there was no special relationship between Mr. Peck and the ICE agents that would give rise to liability for a claim of NIED. *Def. Mot*. 34. But key factors supporting the finding of a special relationship are alleged in the Complaint.

A duty to reasonably avoid emotional harm to others arises "in circumstances in which a special relationship exists between the actor and the person emotionally harmed." *Curtis v. Porter*, 784 A.2d at 18, 25 (Me. 2001). Factors such as a plaintiff's vulnerability, the disparity in power between the plaintiff and the tortfeasor, and whether the tortfeasor has some control over the plaintiff's welfare are considered when determining if a special relationship existed which gives rise to a corresponding duty of care. *Kimball v. Hower*, No. 1:12-CV-00076-JAW, 2013 WL 4500571, at *16 (D. Me. Aug. 21, 2013); *Frausto v. Dep't of California Highway Patrol*, 267 Cal. Rptr. 3d 889, 906 (2020). The relationship between a law enforcement officer and an arrestee can constitute a special relationship. *See Frausto*, 267 Cal. Rptr. 3d at 906 (concluding that special relationship existed between arresting officers and arrestee).

Based on the Maine case law broadly interpreting the scope of the "special relationship" element of the NIED tort, Maine's Law Court would likely find the relationship between a law enforcement officer and an arrestee, at least under the circumstances here, plausibly constitutes a "special relationship." When considering whether a "special relationship" existed in the *Kimball* case, this Court emphasized that a "special vulnerability or disparity of power" is what characterizes the relationships the Maine Law Court has found to be "special" for NIED purposes.

*Kimball*, 2013 WL 4500571, at *15-*16 (concluding that no "special relationship" existed where there was no special vulnerability or disparity of power).

The Complaint here plausibly alleges a significant disparity in power between, on the one hand, Mr. Peck, an unarmed, 67-year old man with pre-existing injuries and without the power of the state behind him, and, on the other hand, Lapointe and Semler, armed, masked, federal law enforcement agents who had been given marching orders by the federal administration to terrorize member of public who dared to resist the violent and illegal deportation of our immigrant neighbors of color.[6]

Mr. Peck's welfare was also completely in the hands of ICE Agents Lapointe and Semler. They confined Mr. Peck inside his vehicle, with no means of escape, in fear that deadly force would be used against him. Given the history of similar misconduct by ICE agents against peaceful observers, Mr. Peck had good reason to worry that, if these ICE agents so decided, they easily could shoot him dead on the side of the road and then falsely claim that he had threatened them or resisted arrest. These extraordinary circumstances give rise to a special relationship between Agents Lapointe and Semler and Mr. Peck such that they owed him a duty of care to "act reasonably to avoid emotional harm." *Curtis*, 784 A.2d at 25.

Maine has no controlling precedent addressing the possible special relationship between an arresting officer and an arrestee for purposes of the tort of NIED. In *Richards v. Town of Eliot*, the arrestee failed to argue for a "special relationship" between arrestee and arresting law enforcement officer. *Richards v. Town of Eliot* 780 A.2d 281, 293 (Me. 2001). So the Maine Law Court did not consider whether there might be such a "special relationship." *Id.*; *see also Alley v.*

[6] TIME, Trump Warns, Military Parade Protests Will Face 'Very Big Force,' YouTube (June 10, 2025), https://www.youtube.com/watch?v=kuKjAIBP8go&t=52s ; Presidential Memoranda, *Countering Domestic Terrorism and Organized Political Violence* (Sept. 25, 2025), https://www.whitehouse.gov/presidential-actions/2025/09/countering-domestic-terrorism-and-organized-political-violence/.

*Alley*, 840 A.2d 107, 108 (Me. 2004) (Maine Law Court will not consider issues that are not briefed). At this early stage of the case, it is enough for the Court to find that the Complaint alleges facts that could plausibly state a special relationship under Maine law. In any event, this Court should not assume Maine law would preclude finding a special relationship here and instead, if the Court has doubts, should certify this issue to the Maine Law Court.

**II. If the Court grants the United States' motion to substitute, Mr. Peck may pursue MCRA claims against the United States through the FTCA because MCRA explicitly makes private persons liable for violations of constitutional rights.**

The United States argues that Mr. Peck may not pursue his MCRA claims through the FTCA because such claims are barred by sovereign immunity. *Motion* at 11-15. Alternatively, the United States argues that Mr. Peck's MCRA claims fail because he has not sufficiently alleged violations of his First or Fourth Amendment rights. *Id.* The United States arguments all fail but the Court need not reach these arguments at all because Mr. Peck has filed his MCRA claims solely against Defendants Lapointe and Semler. The Court, therefore, need only reach these arguments in the United States' Motion if it grants the United States's other motion to substitute itself for Lapointe and Semler (ECF No. 25). Given the contingent and speculative nature of the United States' arguments about possible MCRA claims of Mr. Peck against the United States, which are not asserted in his pending *Complaint*, Mr. Peck requests that the Court defer the briefing on these unripe claims until and unless the Court grants the United States's substitution motion. For now, out of an abundance of caution, Mr. Peck merely outlines why the government's defenses to these theoretical MCRA claims warrant in-depth briefing while expressly reserving his right to provide such briefing if and when these claims become ripe.

### A. Mr. Peck could pursue his MCRA claims through the FTCA if the Court granted the United States' motion to substitute.

The United States argues that Mr. Peck cannot pursue his MCRA claims against it through the FTCA because they are "constitutional tort" claims that could not be pursued against a "private person" and thus do not fall within the FTCA's waiver of sovereign immunity. *Motion* at 12 and 15. These arguments fail for two reasons. **First**, in its motion to substitute, the United States makes the exact opposite argument that it makes here: that Mr. Peck's MCRA claims are *not* constitutional tort claims, ECF No. 25 at ¶ 3, and thus do not fit within the Westfall Act's carveout for "constitutional torts," *Davric Maine Corp. v. U.S. Postal Serv.*, 238 F.3d 58, 65 (1st Cir. 2001). The United States cannot have it both ways. If Mr. Peck's MCRA claims *are* constitutional tort claims, he may pursue them against Defendants Lapointe and Semler; if his MCRA claims *are not* constitutional tort claims, he may pursue them under the FTCA.

**Second**, Mr. Peck's MCRA claims satisfy all the elements for a FTCA claim because the MCRA, contrary to the Government's argument, subjects a "private person," 28 U.S.C. § 1346(b)(1), to liability for constitutional violations. Indeed, 5 M.R.S. § 4684 was added to the MCRA to make it clear that "private parties" may be sued for interfering with any person's constitutional rights "whether or not acting under color of law." 5 M.R.S. §§ 4682(1-A) and 4684; *see also* Christopher Parr, *The Maine Civil Rights Act: History, Enforcement, Application, and Analysis*, 53 Me. L. Rev. 189, 196 (2001) (discussing legislative history behind enactment of § 4684). Thus, the MCRA "explicitly provides for a remedy against interference of rights by private persons." *Clifford v. MaineGeneral Med. Ctr.*, 91 A.3d 567, fn. 19 (Me. 2014).[7] Therefore,

[7] *See also Murray v. Murray*, No. CV-05-161, 2006 WL 5255496 (Me. Super. Dec. 13, 2006) (plaintiff could pursue MCRA claim against private defendant for interference with her state constitutional rights).

contrary to the Government's position, if Lapointe and Semler had been private persons, they could be held liable under the MCRA for interfering with Mr. Peck's constitutional rights.

### B. Mr. Peck has sufficiently alleged violations of the First and Fourth Amendment.

#### 1. The Complaint states a plausible claim that Defendants Lapointe and Semler violated Mr. Peck's First Amendment rights.

The Government makes only one argument about the First Amendment: "Following law enforcement in a motor vehicle is simply not a protected First Amendment activity." ECF No. 26 at 16. This argument fails for three reasons. **First**, Mr. Peck engaged in First Amendment-protected activity in addition to following ICE Agents Lapointe and Semler. He (1) observed the Scarborough ICE facility *before* he started to follow Lapointe and Semler (*Compl.* at ¶¶ 54-55); (2) recorded Lapointe and Semler when they detained him on the side of road (ECF No. 6-1); and (3) contested their false claim that he was impeding their activities (*Compl.* at ¶¶ 81-83). Under controlling precedent, these were all First Amendment-protected activities. *See Glik v. Cunniffe*, 655 F.3d 78, 82 (1st Cir. 2011) (observing, video recording, and gathering information about law enforcement officers' activities are protected under the First Amendment)[8]; *City of Houston, Tex. v. Hill*, 482 U.S. 451, 461 (1987) ("the First Amendment protects a significant amount of verbal criticism and challenge directed at police officers").

While Lapointe and Semler did not explicitly mention Mr. Peck's actions of observing the ICE facility, recording them, or disagreeing with them when they threatened to arrest him, Mr. Peck can still establish a prima facie case of First Amendment retaliation based on those activities. To state a prima facie case of First Amendment retaliation, the plaintiff must show (1) that they

[8] *See also Massimino v. Benoit*, 188 F.4th 120, 130 (2d Cir. 2026) (Second Circuit joined eight other Circuits in holding that recording law enforcement is a First Amendment-protected activity).

engaged in constitutionally protected conduct; (2) that they were subjected to an adverse action by the defendant; and (3) that the protected conduct was a substantial or motivating factor in the adverse action. *Pollack v. Reg'l Sch. Unit 75*, 12 F. Supp. 3d 173, 188 (D. Me. 2014). For the third element, close "temporal proximity" between the adverse action and the constitutionally protected conduct will suffice. *Id.* at 190 (temporal proximity of five days sufficed to establish prima facie case and defeat motion to dismiss). The temporal proximity in this case—in which the protected conduct and adverse actions occurred moments apart—easily satisfies the third element. Further, a fact-finder could plausibly infer that the agents escalated their threats against Mr. Peck, to the point of threatening to violently arrest him, because he had the temerity to both video record them and repeatedly challenge their allegation that he broke the law. Indeed, the agents did not threaten violence until after Mr. Peck challenged their assertion that he was criminally impeding their activities. *Compl.* at ¶¶ 81-85. Thus, because Mr. Peck has sufficiently pleaded a prima facie case of retaliation based on all three of these protected activities, these claims should all survive a motion to dismiss. *Corson v. Modula, Inc.*, No. 2:20-CV-104-DBH, 2020 WL 4194498, at *5 (D. Me. July 21, 2020) (when a plaintiff sufficiently pleads a prima facie case the court should deny a motion to dismiss).

Regarding Mr. Peck's conduct of observing the agents while he followed them from a safe distance, the Motion fails because the settled First Amendment right to observe law enforcement officers has no exception for observing law enforcement officers while driving at a safe distance behind them. Unsurprisingly, the Government cited no cases holding that following a law enforcement officer at a safe distance is not protected First Amendment activity. The government cites *Colten v. Kentucky* but that case is inapposite. ECF No. 26 at 15-16 (*citing Colten v. Kentucky*, 407 U.S. 104 (1972)). In *Colten*, the Supreme Court held that there is "no constitutional right to

observe the issuance of a traffic ticket or to engage the issuing officer in conversation." 407 U.S. at 109. But context matters. In *Colten*, the Supreme Court considered whether a statute prohibiting "public inconvenience, annoyance or alarm" violated an unruly onlooker's right to free speech. *Id.* at 108–09. The onlooker in question had pulled over to the side of the road behind a police officer issuing a traffic citation with "no purpose other than to cause inconvenience and annoyance." *Id.* at 109. The onlooker also impeded public safety by stopping on a crowded roadside strip and refusing police instructions to leave the area. *Id.* Because the onlooker had "no constitutional right to observe" in these circumstances, the Court held that the statute was constitutional *as applied* to those specific circumstances. *Id.* at 109–10. Unlike the onlooker in *Colten*, Mr. Peck did not impede public safety or interfere with law enforcement activity when he followed Lapointe and Semler. He followed all traffic laws and stayed a safe distance behind them. In that way, he was more like the observer in *Glik*, who watched and recorded officers making an arrest from "roughly ten feet away." 655 F.3d at 80. *Colten* also materially differs from this case because the Agents here, unlike the officer in *Colten*, threatened to arrest Mr. Peck if he followed them in the future. *Compl.* at ¶¶ 80-85. This threat of a future arrest constituted a prior restraint on Mr. Peck's First Amendment rights.[9] Therefore, for all these reasons, Mr. Peck has pleaded a plausible violation of his First Amendment rights.

[9] *See Robinson v. Fetterman*, 378 F. Supp. 2d 534, 541 (E.D. Pa. 2005) (threat of future arrest for recording police officers constituted unlawful prior restraint); *Garcia v. Montgomery Cnty., Maryland*, 145 F. Supp. 3d 492, 511 (D. Md. 2015) (jury could reasonably find that police officer engaged in unconstitutional prior restraint when he inhibited plaintiff from disseminating information about officer's activity).

**2. The Complaint states a plausible claim that Defendants Lapointe and Semler violated Mr. Peck's Fourth Amendment rights.**

Agents Lapointe and Semler violated Mr. Peck's Fourth Amendment rights when they seized Mr. Peck without any reasonable suspicion that he had committed or planned to commit a crime. The United States argues that the Agents (1) did not seize Mr. Peck and (2) even if they did seize him, they had reasonable suspicion that he planned to ambush them. *Motion* at 16-20. These arguments both lack merit.

**First**, it is at least plausible that Lapointe and Semler seized Mr. Peck. The analysis above supporting the plausibility of Mr. Peck's false arrest claim also supports his overlapping claim under the Fourth Amendment. When determining whether a seizure occurs under the Fourth Amendment courts consider the following question: "Would a reasonable person standing in the shoes of the individual who is approached have felt free to cease interaction with the officer and depart?" *United States v. Espinoza*, 490 F.3d 41, 49 (1st Cir. 2007). Law enforcement officers can seize someone through "physical force," which can be as slight as a "mere touch," or through a "show of authority." *Torres v. Madrid*, 592 U.S. 306, 311, 317 (2021).

In *Espinoza*, the First Circuit affirmed a trial court's finding that an ICE agent seized the defendant when he approached the defendant in a parked vehicle and asked him to turn off the engine. *Espinoza*, 490 F.3d at 49. The command for Mr. Peck to lower his window functionally equated to the command in *Espinoza* to turn off the engine—both commands were a show of authority that reasonably signaled to Mr. Espinoza and Mr. Peck that they were not free to leave. Indeed, as discussed above, courts in similar circumstances have held that a seizure occurred when a law enforcement officer commanded a person to lower their vehicle window. *See* section I.A *supra*. Further, Mr. Peck knew that ICE agents had a practice of quickly breaking people's car windows and pulling them through the window when the person did not comply with their

requests. *Compl.* at ¶¶ 88-89. He reasonably feared that Lapointe and Semler would use similar tactics if he did not comply. The fact that Agent Lapointe touched Mr. Peck's car added to Mr. Peck's reasonable belief that he could not leave given what happened to Renee Good when she tried to drive away from ICE agents touching her vehicle.[10]

**Second**, the Government erroneously argues that, even if Lapointe and Semler seized Mr. Peck, the seizure complied with the Fourth Amendment because they suspected Mr. Peck planned to ambush them. ECF No. 26 at 18-20. Improperly skewing the facts against Mr. Peck, the Government likens Mr. Peck's actions to someone who runs away from a law enforcement officer. ECF No. 26 at 20. When someone runs away from a law enforcement officer, that is the "consummate act of evasion" because the individual does not want the law enforcement officer to see what he is doing. *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000). Mr. Peck acted in the exact opposite way of someone who runs away from law enforcement officers. When Lapointe and Semler pulled over to the side of the road, Mr. Peck pulled right up behind them. *Compl.* at ¶ 64. He was not trying to surprise, hide from, or evade them, like someone planning an ambush would do. Any reasonable suspicion that Lapointe and Semler might have had that Mr. Peck planned to ambush them was eliminated when he made himself clearly visible to them without taking any hostile or threatening action toward them.

The Government's argument also fails because the ICE agents unreasonably extended their detention of Mr. Peck after he made crystal clear to them that he only planned to observe them, not impede their activities. "The scope and duration of a vehicle stop must be reasonably related to the circumstances that justified the stop in the first place unless the police have a basis for

[10] As discussed above, when a law enforcement officer touches a vehicle with a driver inside it, that can constitute a seizure similar to when an officer touches a person directly. *See* Section I.A *supra*.

expanding their investigation." *United States v. Henderson*, 463 F.3d 27, 45 (1st Cir. 2006) (police violated Fourth Amendment when they extended traffic stop to ask for car passenger's identification and searched his record). When they accused Mr. Peck of criminally impeding them, Mr. Peck told Lapointe and Semler that he was merely observing them and had no desire to impede their activities. *Compl.* at ¶¶ 81-83. Even if they had reasonable suspicion to detain Mr. Peck in the first place, which they did not, Lapointe and Semler had no basis to continue their detention of Mr. Peck after he told them he was merely observing them. Yet Lapointe and Semler continued to threaten Mr. Peck with arrest after that, unlawfully prolonging the seizure. *Id.* at ¶¶ 82-85.

The Government's argument further fails because a reasonable ICE agent would have known that Mr. Peck acted consistently with individuals across the country who sought to lawfully observe ICE agents' activities. *Compl.* at ¶¶ 111, 124-25 and fn. 19 and 29. Mr. Peck did nothing to indicate to Lapointe and Semler that he was doing anything other than following them to observe (not forcibly impede) their activities, just like countless other individuals across the country had done without incident, let alone an "ambush."

**Conclusion**

As demonstrated above, the government has neither complied with the applicable rules of civil procedure nor come close to showing that Mr. Peck's Complaint fails to state plausible claims under the FTCA for the Maine common law torts of false arrest, assault, battery, intentional infliction of emotional distress and negligent infliction of emotional distress. Thus, this Court should deny the motion to dismiss in its entirety.

Respectfully submitted,

Date: November 16, 2026

/s/ David G. Webbert
David G. Webbert
Braden A. Beard
Allan K. Townsend

Isabelle L. Holt
Johnson, Webbert & Beard, LLP
1 Bowdoin Island Mill, Ste. 300
Topsham, Maine 04086
Telephone: (207) 623-5110
dwebbert@work.law

Shelby Leighton
Ana M. Builes
Public Justice
1620 L St. NW, Suite 630
Washington, DC 20036
(202) 797-8600
sleighton@publicjustice.net

*Attorneys for Plaintiff*